**JUDGE CASTEL**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

# 13 CIV 7319

ARJENT LLC and ROBERT P. DEPALO,

                Plaintiffs,

-against-

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION,

                Defendant.

Case No.
*ECF Case*

COMPLAINT



Plaintiffs Arjent LLC ("Arjent") and Robert P. DePalo, by their attorneys Garvey Schubert Barer, complain of the Defendant and allege:

## INTRODUCTION

1.  Defendant Securities and Exchange Commission ("SEC" or the "Commission") has conducted a two year investigation pursuant to §20 of the Securities Act of 1933 (15 U.S.C. §77t) and §21 of the Securities Exchange Act of 1934 (15 U.S.C. §78u), during which it has, *inter alia*:

    A.  Purposefully concealed the existence of a Formal Order of Investigation ("FOI") while interviewing Mr. DePalo;

    B.  Deprived Plaintiffs of their right to counsel;

    C.  Repeatedly harassed investors;

    D.  Slanderously insinuated to investors that Mr. DePalo illegally withdrew investor funds from Pangaea Trading Partners LLC ("Pangaea"), despite the Commission having in its possession the Pangaea offering memoranda clearly disclosing that payments to Mr. DePalo were in consideration for the transfer of stock to Pangaea and that Mr. DePalo has received only a fraction of the consideration he is due;

1

E.  Harassed a United Kingdom broker/dealer (Arjent Ltd., hereinafter "Arjent UK") for all of its records going back to 2007, claiming relevance based on transactions wholly outside the Commission's jurisdiction, and which had absolutely nothing to do with either the Plaintiffs or Arjent UK;

F.  Misrepresented to the UK Financial Control Authority ("FCA") that it (the SEC) has the authority to protect these documents from FOIA disclosure, when in fact such authority rests with the courts, and FOIA disclosure could subject Arjent UK to criminal penalties; and

G.  Imposed, and continues to impose, burdensome and extreme costs on Plaintiffs, a small broker/dealer and its Chief Executive Officer, through repetitive, unbounded and in some circumstances retaliatory demands.

2.  The Commission has not filed any charges or even issued a Wells letter, despite these tactics, and despite having received among other things (a) the disclosure memoranda for all placements the SEC identified, (b) all the subscription agreements for all the placements, (c) all of Arjent's financial records, including its general ledger, bank account statements, financial statements, audits and all accountants' audit work papers back to 2009, (d) Mr. DePalo's personal bank records, 1099s, and W-2 forms, and (e) all e-mails related to the placements; and having repeatedly interviewed investors.

3.  Recent academic studies demonstrate that this conduct is consistent with the SEC's favoring large broker/dealers while harassing small broker/dealers (those with less than 1,000 employees), in an effort to build a record to support false public claims of effective regulation.

4. This "investigation" continues unabated by ongoing demands (a) on Plaintiffs for voluminous information by letter or email without subpoenas and (b) third-parties. Accordingly, there is no proceeding available for review of the Commission's misconduct other than the Administrative Procedure Act ("APA"), 5 U.S.C. §§701 *et seq.*

5. Plaintiffs are fully prepared to answer any charges and are confident of full vindication under either administrative or judicial processes. But absent a judicial declaration that the Commission has acted, and is acting, in violation of Plaintiffs' constitutional equal protection rights, is violating its own rules and regulations, is acting outside of its jurisdiction and in an arbitrary and capricious manner in abuse of its discretion, and an injunction from this Court stopping such egregious behavior, Plaintiffs face ongoing substantial and irreparable harm.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction over the action pursuant to 28 U.S.C. §§1331, 1337, 1361 and 2201 and 5 U.S.C. §§701-706.

7. The United States government has waived sovereign immunity against this suit pursuant to 5 U.S.C. §702.

8. Venue is proper in this District pursuant to 28 U.S.C. §§1391(b) and (e).

## PARTIES

9. At all times hereinafter mentioned, Arjent was, and is, a duly registered securities broker/dealer with its place of business in the City, County, State and Southern District of New York.

10. At all times hereinafter mentioned, DePalo is a licensed person in the securities industry registered with Arjent, is a shareholder of both Arjent and Arjent's parent company, and is Arjent's Chief Executive Officer.

11. At all times hereinafter mentioned, the SEC was, and is, the commission authorized by the United States Congress to enforce the securities laws to the extent of the jurisdiction granted by Congress and otherwise limited by acts of Congress.

## THE FIELD EXAMINATION

12. In the summer of 2011, the Commission's New York Regional Office began what purported to be a routine field examination of Arjent. The Commission conducts occasional field examinations of all registered broker-dealers within its jurisdiction, to ascertain these firms' compliance with applicable laws and regulations. Among the Commission staff ("Staff") assigned to the field examination of Arjent was Mr. Terrence Bohan, who reported to Mr. Steven Vitulano, the Commission's Assistant Regional Director for the New York Regional Office.

13. The Commission's standard procedure during a field examination is to dispatch Staff to the office of the firm under examination and conduct an on-site inspection of files and records. A small broker/dealer with no in-house legal capacity does not customarily have counsel present during this inspection, given the cost of outside legal counsel, and since a routine examination does not imply that the Commission harbors any suspicion of wrongdoing on the part of the firm, and the presence of counsel can be misinterpreted as a reluctance to cooperate with agency examiners.

14. By letter dated August 19, 2011 (the "Voluntary Request"), signed by Mr. Vitulano, supposedly in connection with the field examination, the Commission requested Mr. DePalo to provide voluminous documentation regarding three entities -- Brookville Fund Managers ("BFM"), Brookville Special Purpose Fund LLC ("Brookville SPF") and Pangaea Trading Partners, LLC ("Pangaea") -- listed as outside business activities ("OBA"s) for several Arjent LLC employees.

15. Pangaea and Brookville SPF are not SEC-registered broker-dealers, but are issuers of securities that were reported as outside business activities of Mr. DePalo's. Pangaea had conducted a private placement of securities (the "Pangaea Placement") pursuant to which certain disclosed payments were allowed to Mr. DePalo in consideration of his transfer to Pangaea of stock in the parent companies of Arjent and Arjent UK. Arjent did not act as a selling agent for the Pangaea Placement or collect any fees in connection with the Pangaea Placement. Brookville SPF had conducted a private placement of securities (the "Brookville Placement") in which Arjent and Arjent UK acted as placement agents and were paid certain fully disclosed commissions.

16. At the time the Voluntary Request was made, the SEC had not issued any formal order of investigation with respect to Arjent, Pangaea, Brookville SPF, or Mr. DePalo. Nevertheless, in the interest of transparency and cooperation, Mr. DePalo responded in full to the Voluntary Request. Over the course of several months, Mr. DePalo produced an abundance of documents not only for the three requested entities (Arjent, Pangaea and Brookville SPF), but also for the entity Veritas High Yield Fund, LLC ("Veritas"), including, but not limited to, all private placement memoranda, all subscription agreements, and the records of receipts and payments of all escrow accounts into which investor funds were deposited.

17. Despite Mr. DePalo's good faith cooperation with the Voluntary Request, SEC staff remained unsatisfied and intensified its examination through September, October and November of 2011. In a series of increasingly adversarial communications, SEC investigators made additional requests for Mr. DePalo's personal financial records, among other items. Based on the Commission's own rules, Mr. DePalo declined to provide his personal financial records, except to the extent of showing receipt of funds from Pangaea and the immediate reversion of

much of those funds to Arjent UK. Having received the Pangaea memorandum and such banking records, Mr. Bohan knew or should have known that Mr. DePalo was paid far less for his contribution to Pangaea than was fully disclosed and authorized.

18. Nevertheless, in or about late October or early November, 2011, Mr. Bohan made threats directly to Mr. DePalo and to other Arjent employees as to the consequences of Mr. DePalo not turning over all of his personal financial records, despite the fact that the Commission's own rules did not require him to do so.

### THE INVESTIGATION BEGINS UNDER COVER OF THE EXAMINATION

19. In October, 2011, while the Commission was still investigating Plaintiffs under cover of an ostensible "field examination," Commission Staff including Mr. Bohan began placing calls to Pangaea investors. In disregard of Commission rules, the Staff conducting these interviews did not notify investors of the pendency of any ongoing Investigation.

20. Upon information and belief, the Staff insinuated that Mr. DePalo had converted funds to which he was not entitled. At the time of these conversations, the Staff had the Pangaea placement memorandum in its possession and therefore actually knew or should have known that the payments owed to Mr. DePalo were fully disclosed and authorized in consideration of his equity contribution to Pangaea.

21. Further, the Pangaea offering memorandum included two full years of audited financial statements for both Arjent and Arjent UK, so that the Staff knew or should have known that all Pangaea investors had complete disclosure of all material facts regarding the potential investment.

22. Additionally, at the time of these conversations, the Staff had the Pangaea escrow account ledgers and Mr. DePalo's personal bank account to the extent of all information showing

receipt of funds from Pangaea and the prompt wire of most of those funds to Arjent UK. Therefore, at the time of these conversations the Staff actually knew or should have known that Mr. DePalo had in truth received and retained just a small fraction of the amount due to him as disclosed in the Pangaea placement memorandum.

23. Therefore, not only were the interviews themselves in violation of the Commission's rules and regulations, but upon information and belief the Staff's insinuations regarding Mr. DePalo's conduct were intentionally or recklessly defamatory, and intended to induce interviewees to incriminate Mr. DePalo.

24. The Commission's interviews with Pangaea investors have continued through the present day.

25. Upon information and belief, during these calls, Commission Staff continue to ask a number of leading and alarming questions, the foreseeable outcome (if not intended purpose) of which was to frighten investors into believing that their Pangaea investments would be imminently lost

26. The basis of Plaintiffs' information and belief are reports from investors and a statement made by Mr. Bohan at a subsequent meeting attended by Mr. Vitulano, Mr. Bohan, Mr. DePalo and counsel, indicating that he had pre-judged Mr. DePalo guilty of an unspecified (and as yet, two years later, uncharged) securities violation.

27. On November 4, 2011, Mr. Vitulano and Mr. Bohan appeared together at Arjent's offices without prior notice, and met with Mr. DePalo in a continuing effort to coerce him into providing, *inter alia,* his complete personal financial records. Believing that this was in connection with the ongoing field examination, Mr. DePalo allowed the interview by Messrs. Vitulano and Bohan in the absence of counsel.

28. Unbeknownst to Plaintiffs, however, the previous day, November 3, 2011, the SEC had issued a formal order of investigation (the "Initial FOI"), specifically naming Arjent LLC and Pangaea in its recitation of facts. The commencement of the Investigation was not disclosed to Mr. DePalo at his November 4, 2011 interview the following day. Neither Mr. Vitulano nor Mr. Bohan were authorized by the Initial FOI to conduct the investigation. The conduct of the Investigation through unauthorized officials was in and of itself a violation of Commission rules.

29. Commission Staff's failure to disclose the issuance of the Initial FOI to Mr. DePalo operated to deprive him of his right to counsel, a right the Commission guarantees to all subjects of its ongoing investigations.

30. Commission Staff continued to make inquiries of Mr. DePalo and other Arjent employees under a pretext of informality, while concealing the Initial FOI for a period of two weeks. During this two week period, the Commission also had untrammeled access to Arjent emails and other documents without regard to the scope of the Initial FOI, and in the absence of Arjent's counsel. Had the Staff disclosed the Initial FOI, Mr. DePalo and Arjent would have immediately enlisted counsel during this period as to the scope of permissible investigation under the Initial FOI.

31. Upon information and belief, the Commission's conduct of the Investigation through unauthorized field examiners appears to have been coordinated intentionally, so as to create an appearance of continuity, and prevent notice to Arjent and Mr. DePalo of any possible investigation.

32. Statements made by Messrs. Vitulano and Bohan reveal that they were fully aware of the Investigation throughout this two-week period. On November 5, 2011, one day

after the examiners' undisclosed visit to Arjent's offices, Mr. Bohan spoke with Mr. DePalo to reiterate the Staff's request for all his personal financial records. When Mr. DePalo adhered to the position that the SEC was not entitled to such records because no formal investigation was underway, Mr. Bohan advised Mr. DePalo that the SEC would have the requested documents within six months and warned Arjent's Chief Compliance Officer about the "next shoe dropping."

33. The Initial FOI was not transmitted to Plaintiffs or their undersigned counsel until November 17, 2011, and only after counsel's direct inquiry whether an FOI had issued.

### THE COMMISSION REFUSES TO DISCLOSE AN AMENDED FOI

34. In the spring of 2012, the Commission issued its first subpoenas (the "First Subpoenas") in connection with the Investigation, requesting documents regarding, *inter alia*, Pangaea, BFM, Brookville SPF, Veritas and Arjent UK, even though most of these documents had been produced in response to the Voluntary Request, and the Initial FOI mentioned only Arjent and Pangaea (and not BFM, Brookville SPF, Veritas or Arjent UK).

35. Therefore, by letter dated May 14, 2012, counsel wrote Commission attorney Mona Akhtar on behalf of Arjent LLC, objecting to the aspects of the First Subpoenas (a) beyond the scope of the Initial FOI, and therefore in contravention of the SEC's rules and procedures; (b) seeking documents from Arjent UK as being outside the Commission's jurisdiction; and (c) that were duplicative of the documents produced in response to the Voluntary Request.

36. By letter dated September 19, 2012, the Commission transmitted new subpoenas (the "Second Subpoenas") to supersede and replace the First Subpoenas. The Second Subpoenas were substantially identical to the First Subpoenas. In the cover letter transmitting the Second

Subpoenas, Ms. Akhtar stated that the Second Subpoenas were issued pursuant to an Amended Order of Investigation dated September 7, 2012 (the "Amended FOI"). However Ms. Akhtar did not attach a copy of the Amended FOI.

37. Counsel sent Ms. Akhtar an email that evening, and a letter the following day to Mr. Paley, requesting a copy of the Amended FOI on behalf of Arjent LLC, pursuant to 17 C.F.R. § 203.7(a). Both of these letters contained all of the representations required by § 2.3.4.2 of the SEC Enforcement Manual regarding requests for copies of formal orders of investigation. Arjent, as recipient of one of the First Subpoenas issued in the course of the Investigation, was entitled to see the amended formal order in effect for the Investigation.

38. Ms. Akhtar did not respond.

39. Counsel again emailed Ms. Akhtar on September 24, 2012 to inquire after the Amended FOI.

40. Ms. Akhtar demanded that counsel disclose which subpoenaed parties counsel represented in addition to Arjent. When counsel declined, Ms. Akhtar summarily denied the request for a copy of the Amended FOI, without explanation. When an explanation was requested, Ms. Akhtar's sole response was to refer counsel to the SEC Enforcement Manual; and she refused a request to provide the legal rationale for her refusal, despite the fact that the requests for the Amended FOI had fully complied with § 2.3.4.2 of the SEC Enforcement Manual.

## COMMISSION MOVES TO COMPEL PRODUCTION

41. Rather than provide a copy of the Amended FOI and then to attempt resolve objections to the Second Subpoenas without judicial intervention, on November 14, 2012, the Commission filed an order to show cause to compel compliance with the subpoenas.

42. Despite having previously received the Pangaea placement memorandum and the relevant excerpts of Mr. DePalo's personal financial records (demonstrating full disclosure of payments due Mr. DePalo for his contribution to Pangaea and that he had retained just a small percentage of that amount), the Commission's supporting papers asserted alleged possible defalcations by Mr. DePalo as a basis for the investigation.

43. On November 19, 2012, the Commission's litigation counsel finally provided a copy of the Amended FOI. On receipt, Plaintiffs' counsel and the Commission reached agreement on additional production, but Plaintiffs' objections as to duplication and the Commissions attempted extra-territorial reach remained unresolved.

44. At the hearing on the Commission's application, the Court ruled that Plaintiffs need not produce again documents that had already been provided to the Staff, and the Commission withdrew its application for documents outside the United States.

45. Ruling that it was bound by precedent not to look behind the SEC's factual allegations, the Court granted the balance of the Commission's application. Most of the documents requested by the Second Subpoena had been produced, but since the Amended FOI added a number of entities (including entities owned by Robert DePalo's wife, Rosemary DePalo) not named in the Voluntary Request or the Initial FOI, full production was provided as to these entities as well.

46. One week before the scheduled hearing on the Commission's application, the SEC served various bank subpoenas for the accounts, among others, of both Mr. and Mrs. DePalo.

47. On February 15, 2013, Mr. and Mrs. DePalo moved to quash the subpoenas under the Financial Privacy Act of 1978, 12 U.S.C. §3410.

48. By Opinion and Order dated March 8, 2013, the Court granted the motion as to Mrs. DePalo, holding that the Commission had not explained how Mrs. DePalo's bank records are relevant to the investigation.

**ONGOING COMMISSION MISCONDUCT: EXTRATERRITORIAL REQUESTS**

49. Notwithstanding the Commission's representation to the Court that it was not seeking Arjent UK documents outside the United States, the Commission nevertheless pursued precisely those documents in the United Kingdom through the UK Financial Control Authority ("FCA"), acting in excess of its jurisdiction and pursuing its efforts through key misrepresentations to the FCA.

50. On or about June 4, 2013, Arjent UK received a request for information from the FCA that essentially demanded every document regarding Arjent UK's business going back to 2007. The request called for voluntary production of 34 categories of documents including, for example, every Arjent UK financial record, and documents relating specifically to the 2007 and 2008 private placements of an entity known as SPK Partners LLC ("SPK"), going back to January 1, 2007. The FCA's letter states that "[t]he FCA has received a request from an overseas regulator. . . . Details of the information sought from the overseas regulator are set out below." Obviously from the items requested, this letter was sent at the SEC's behest.

51. SPK is one of the entities added to the Amended FOI. Neither Arjent nor Arjent UK had any involvement with, or relationship to, the SPK 2007-2008 placement. Mr. DePalo has never been an owner, director, officer or employee of SPK, and has never had any affiliation with SPK whatsoever. The only nexus between SPK and Arjent is that one of SPK's principals, Mr. Gregg Lerman, is presently a registered person with Arjent. SPK purchased an interest in Arjent UK in 2009.

52.     On information and belief, the FCA subsequently advised Arjent UK that the request was on behalf of the SEC.

53.     Upon information and belief, during a conference call among Arjent UK, its counsel, the FCA and the SEC, Arjent UK's counsel asked the relevance of going as far back as 2007. Relevance was not apparent since the basis of the investigation proffered to the Court in the Commission's enforcement application was alleged diversion of Pangaea assets, and that placement did not commence until 2010.

54.     In response, on information and belief, the Staff for the first time proffered a new theory, different than that presented to the Court to enforce the subpoenas. Upon information and belief, the SEC Staff represented that Arjent UK 2007 and 2008 financials were presented as part of private placements by SPK.

55.     This is a blatant misstatement and an obvious pretext. Given the documentation in its possession, the Commission knows or should know that Arjent UK had absolutely nothing to do with the SPK 2007 and 2008 placements, and that the SPK memorandum for that placement absolutely does not contain any reference whatsoever to – let alone the financial information of – Arjent UK. The only possible purpose for demanding almost seven year old detailed information is to harass and burden Arjent UK because the UK entity is reported to Arjent, in accordance with the rules of the Financial Industry Regulatory Authroity ("FINRA"), as an OBA of, *inter alia*, Mr. DePalo and Mr. Lerman.

56.     Moreover, the Commission knows or should know that the SPK private placements are beyond its jurisdiction. Given the documents that it possesses, the SEC knows or should know that SPK is not a listed security and was not sold or purchased in the United States.

57. Further, despite having withdrawn its request to enforce the Second Subpoenas to the extent it requested documents as to Arjent UK outside the United States, and that Arjent UK transacts absolutely no business in the United States, the FCA (on information and belief, at the SEC's request) nevertheless also sought unlimited organizational and financial information relating to Arjent UK.

58. On information and belief, during the conference call as aforesaid with the SEC and the FCA, Arjent UK's counsel expressed concern that Arjent UK would be exposed to criminal liability under the UK Data Protection Act ("DPA") should the information requested by the SEC be publicly disclosed under the U.S. Freedom of Information Act ("FOIA"). Arjent UK's management and counsel expressed several very serious concerns that: (a) the burden of complying with the FCA's June 4, 2013 request puts Arjent UK's ability to remain in business at risk; and (b) the documents, if placed in the Commission's hands, could not be shielded from public FOIA disclosure – in violation of the DPA.

59. Upon information and belief, an FCA representative advised Arjent UK's counsel that the SEC stated that on its own authority it could "exempt" the documents from FOIA disclosure.

60. This statement misrepresents the SEC's authority to make binding FOIA determinations. Absent special procedures not offered by the Commission, final determination of whether documents need to be produced under FOIA rests with the Courts, not the Commission. The Commission's attempt to induce FCA production of Arjent UK documents under such false pretenses is further evidence of the SEC's excesses of authority.

61. In an attempt to persuade counsel to advise that there is no DPA problem, the Staff referred to Exchange Act 25(d). But the Commission's reliance is misplaced. That section

requires the foreign regulator to represent in good faith that disclosure of protected documents would constitute a criminal violation of that country's laws. That has absolutely nothing to do with what the Commission has the authority to do on its own.

### ARJENT'S UNSUCCESSFUL EFFORTS AT REDRESS WITHIN THE SEC

63. On October 12, 2012, Arjent filed a complaint with the SEC Inspector General, complaining of the conduct alleged in ¶¶12-40, *supra.* ("the OIG Complaint").

64. The Commission filed its motion to compel on November 14, 2012. Plaintiffs received no other response.

65. On September 16, 2013, counsel wrote to the Commission General Counsel, and to supervisory personnel at the Division of Enforcement, Office of International Affairs, Office of Ethics Counsel and the Inspector General, enclosing a copy of the OIG Complaint, and also advising of the conduct alleged in ¶¶46-61, *supra.*

66. On September 19, 2013 and again on September 24, 2013, Arjent's counsel received emails from the Staff making extensive further demands for information and documents, including all Arjent emails back to March, 2009, notwithstanding that (a) the investigation as previously stated to the Court was for an alleged (in reality non-existent) diversion of funds from Pangaea, but the Pangaea placement was not offered until September, 2010; (b) the Staff had unfettered access to Arjent's emails at least from July 2011 through November, 2011; and (c) the Commission's subpoenas have only requested emails related to the private placements, all of which have been repeatedly delivered, along with affidavits so attesting under oath.

67. The timing set forth in ¶¶63-66 *supra.* leads inexorably to the conclusion that the Commission has retaliated each time that Plaintiffs have asserted their legal rights.

**PRESENT STATUS**

68. Over the two year course of its investigation, the Commission has received, *inter alia:* (a) the disclosure memoranda for all placements the SEC identified, (b) all the subscription agreements for all the placements, (c) all the financial records of all the issuers of the placements, (d) all of Arjent's financial records, including its general ledger, bank account statements, financial statements, audits and all accountants' audit work papers back to 2009, (d) all of Mr. DePalo's personal bank records, 1099s, and W-2s from 2009 on, (e) all of Mr. Lerman's personal bank records; (f) 2008 and 2009 audited financial statements of Arjent UK, while all Arjent UK financial statements are publicly available in the United Kingdom; and (e) all e-mails related to the placements. The Commission had untrammeled access to Arjent's books, records and emails even after the Initial FOI was issued. The Commission has repeatedly interviewed investors, in the process besmirching the Plaintiffs.

69. The Commission initially proceeded on one legal theory before the Court, and has subsequently articulated a completely different theory.

70. Nevertheless, not only has the Commission failed to file any charges; it has not even issued a Wells letter requesting comments from Plaintiffs on any allegations contemplated by the Commission.

71. Yet the Commission continues on, imposing untoward costs and embarrassment on Plaintiffs. Each time Plaintiffs have sought redress within the Commission for this conduct, the SEC has retaliated with yet more expensive and burdensome demands. Indeed, the most recent demands are beyond judicial review because they were made without benefit of a subpoena.

NY_DOCS:619337.2

72.     There is no administrative review process as to Defendant's conduct, which is wholly and entirely unrelated to the ultimate adjudication of any charges that may be filed.

## IRREPARABLE HARM

73.     As a result of the Commission's conduct, Plaintiffs have incurred, and continue to incur, very substantial and burdensome legal fees. Unlike major institutions, Plaintiffs do not have an in-house legal staff, and the fees incurred in defense create a substantial burden. Indeed, upon information and belief, this may be precisely what the Commission intends, since despite all its investigation, the literally hundreds of thousands of documents it has obtained, shining a spotlight into every nook an cranny of Arjent and of Mr. DePalo's personal financial life, the Commission is not even able after all this time to issue a Wells letter.

74.     This is consistent with recent academic studies demonstrating the Commission's wholly unfounded bias against small broker/dealers, while treading far more lightly on the major firms that have more resources and cause macroeconomic harm from which we all suffer.

75.     Plaintiffs are unable to recover these costs in damages against the Government.

76.     Additionally, Plaintiffs continue to suffer intangible damage to client relationships with the uncertainty created by any SEC investigation, greatly exacerbated by the Staff's misleading statements to investors.

77.     Plus, compliance with the SEC's voluminous demands creates an overwhelming burden on Arjent's personnel, as it would with any small broker/dealer.

## FIRST CLAIM
(Administrative Procedure Act)

78. Plaintiffs repeat and reallege paragraphs 1 through 77 above as if fully set forth at length herein.

79. By reason of the foregoing, Defendant has acted contrary to its own rules and regulations, in violation of law, in excess of its congressionally established jurisdiction, and in an arbitrary and capricious abuse of its discretion.

## SECOND CLAIM
(Constitutional Equal Protection)

80. Plaintiffs repeat and reallege paragraphs 1 through 77 above as if fully set forth at length herein.

81. Defendant has treated small broker/dealers (defined as broker/dealers with less than 1,000 employees) and their employees generally, and these Plaintiffs in particular, far more harshly than large broker/dealers.

82. There is no rational basis for the Defendant's discriminatory treatment of small broker/dealers generally, and these Plaintiffs in particular.

WHEREFORE Plaintiffs Arjent LLC and Robert P. DePalo respectfully request that judgment be entered against Defendant the United States Securities and Exchange Commission:

    A.    Declaring and adjudging that Defendant has conducted this investigation in violation of Plaintiffs' constitutional rights to equal protection of the laws, in violation of its own rules and regulations, in violation of law, in excess of its jurisdiction, and in an arbitrary and capricious abuse of its discretion;

    B.    Permanently and forever enjoining the Defendant from any further investigation, by formal proceedings or otherwise, of the subject matter stated in the Initial

Formal Order of Investigation and the Amended Formal Order of Investigation, and any matter reasonably related thereto; and

C. Such other, further and different relief as the Court deems just and proper.

Dated: New York, New York
October 16, 2013

GARVEY SCHUBERT BARER

By: _____
Andrew J. Goodman, Esq. (AG-3406)
Malcolm Seymour III (MS-3107)
Ella Aiken (EA-5861)
Attorneys for Plaintiffs
100 Wall Street, 20th Floor
New York, New York 10005
(212) 965-4534 AJG
agoodman@gsblaw.com