# JUDGE CASTEL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ARJENT LLC and ROBERT P. DEPALO,

          Plaintiffs,

-against-

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION,

          Defendant.



Case No.
Cr Case

**13 CV 7319**

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

Dated: New York, New York
      October 16, 2013

**GARVEY SCHUBERT BARER**
Andrew J. Goodman, Esq. (AG-3406)
Malcolm Seymour III, Esq. (MS-3107)
Ella Aiken, Esq. (EA-5861)
*Attorneys for Plaintiffs*
100 Wall Street, 20th Floor
New York, New York 10005
(212) 965-4534 AJG
agoodman@gsblaw.com

# TABLE OF CONTENTS

*Page*

TABLE OF AUTHORITIES ................................................................................................ i

PRELIMINARY STATEMENT ......................................................................................... 1

STATEMENT OF FACTS ................................................................................................. 4

ARGUMENT ................................................................................................................... 14

POINT I
PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS .................................... 14

    A.  Subject Matter Jurisdiction Exists Under § 1331 ................................................ 14

    B.  Sovereign Immunity Has Been Waived By APA § 702 ...................................... 15

    C.  The Claims Are Likely To Succeed .................................................................... 23

        1.  The Commission Has Acted Contrary To Its Own Rules and
             Regulations; and Without Observance of Procedure Required By Law .................... 24

        2.  The Commission Has Acted in Excess of Its Jurisdiction ........................... 28

        3.  The Commission Has Acted in an Arbitrary and
             Capricious Abuse of its Discretion ................................................................ 29

        4.  The Commission's Ongoing Regular Practice and Procedure Discriminates
             Against Small Broker/Dealers Violating the Equal Protection Clause ..................... 31

POINT II
ALTERNATIVELY, PLAINTIFFS HAVE SHOWN FAIR
GROUND FOR LITIGATION AND A BALANCE OF
HARDSHIP TIPPING IN THEIR FAVOR ....................................................................... 34

POINT III
PLAINTIFFS WILL SUFFER IRREPARABLE
HARM ABSENT AN INJUNCTION ............................................................................... 36

POINT IV
AN INJUNCTION SERVES THE PUBLIC INTEREST .................................................. 40

CONCLUSION ................................................................................................................ 41

# TABLE OF AUTHORITIES

*Page*

*Cases*

*Adkins v. Rumsfeld* ........................................................................................22
389 F.Supp.2d 579 (D.Del. 2005)

*Berkovitz v. U.S.* ..........................................................................................23
486 U.S. 531 (1988)

*Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics* ...........................38, 39
403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971)

*Bowen v. Massachusetts* ...............................................................................15
487 U.S. 879 (1988)

*Brenntag Int'l Chems., Inc. v. Bank of India* ...............................................36
175 F.3d 245 (2d Cir.1999)

*Burnside-Ott Aviation Training Center, Inc. v. U.S.* ....................................22
617 F.Supp. 279 (S.D.Fla.1985)

*Cablevision Systems Corp. v. Town of East Hampton* ...............................37, 39
862 F.Supp. 875 (E.D.N.Y. 1994)

*Califano v. Sanders* ......................................................................................14
430 U.S. 99 (1977)

*Cleantech Innovations, Inc. v. NASDAQ Stock Market* ...............................21
2011 WL 7138696 (S.D.N.Y. 2011), *adhered to*, 2012 WL 345902 (S.D.N.Y. 2012)

*Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.* ........................34
598 F.3d 30 (2d Cir.2010)

*Commonwealth of Puerto Rico v. United States* .........................................16
490 F.3d 50 (1st Cir. 2007)

*Compare Altman v. S.E.C.* ............................................................................21
768 F.Supp. 2d 554 (S.D.N.Y. 2011), *aff'd.*, 687 F.3d 44 (2d Cir. 2012)

*Doe v. U.S. Civil Service Commission* .........................................................39
483 F.Supp. 539 (S.D.N.Y. 1980)

*Elk Run Coal Comp., Inc. v. Department of Labor* .....................................21

i

804 F.Supp.2d 8 (D.D.C. 2011)
*Empire Healthchoice Assur., Inc. v. McVeigh* ...............................................................14
547 U.S. 677, 678 (2006)

*Free Enterprise Fund v. Public Co. Accounting Oversight Bd.* ...........................17, 18, 19, 22, 23
___ U.S. ___, 130 S.Ct. 3138 (2010)

*Gellis v. Casey* ...............................................................................................40
338 F.Supp. 651 (S.D.N.Y. 1972)

*Grand River Enterprise Six Nations, Ltd. v. Pryor* ...........................................................34
481 F.3d 60 (2d Cir.2007)

*Gupta v. S.E.C.* ...........................................................................................21, 22
796 F.2d 503 (S.D.N.Y.  2011)

*Immigration and Naturalization Service v. Miranda* ...........................................................29
459 U.S. 14 (1982)

*Jacobson & Co. v. Armstrong Cork Co.* .......................................................................37
548 F.2d 438 (2d Cir.1977)

*Judicial Watch, Inc. v. Rossotti* ...........................................................................30
326 F.3d 1309 (D.C.Cir. 2003)

*Leedom v. Kyne* .............................................................................................28
358 U.S. 184 (1959)

*Marnell v. Kingston Public Access Cable Com'n* ...........................................................37, 39
2009 WL 1811899 (N.D.N.Y. 2009)

*Mayor and City Counsel of Baltimore v. Matthews* .............................................................40
362 F.2d 914 (4th Cir. 1977)

*Metro. Taxicab Bd. of Trade v. City of N.Y.* .................................................................14
615 F.3d 152 (2d Cir.2010)

*Morrison v. National Australia Bank Ltd* .................................................................28, 29
561 U.S. __, 130 S.Ct. 2869 (2010)

*Morton v. Ruiz* .............................................................................................24
415 U.S. 199 (1974)

*Nemer Jeep–Eagle, Inc. v. Jeep–Eagle Sales Corp.* ...........................................................37
992 F.2d 430 (2d Cir.1993)

*New York Public Interest Research Group v. U.S. E.P.A.* ............................................22
249 F.Supp.2d 327 (S.D.N.Y.2003)

*Omoniyi v. Department of Homeland Sec.* ...............................................................39
2012 WL 892197 (S.D.N.Y. 2012)

*Up State Federal Credit Union v. Walker* ...............................................................16
198 F.3d 372 (2d Cir. 1999)

*Presbyterian Church (U.S.A.) v. United States* ..........................................................15
870 F.2d 518 (9th Cir. 1989)

*Public Citizen Health Research Group v. Food and Drug Admin.* ............................................30
704 F.2d 1280 (D.C.Cir. 1984)

*R.H. STEARNS Co. v. United States* ......................................................................29
291 U.S. 54 (1934)

*Raz v. Lee* ...........................................................................................15
343 F.3d 936 (8th Cir. 2003)

*Save the Dolphins v. U. S. Dept. of Commerce* .......................................................23, 30
404 F.Supp. 407 (N.D.Cal.1975)

*Service v. Dulles* .....................................................................................24
354 U.S. 363 (1957)

*Sharkey v. Quarantillo* ................................................................................15
541 F.3d 75 (2d Cir. 2008)

*Sprecher v. Graber* .............................................................................16, 17, 18
716 F.2d 968 (2d Cir. 1983)

*Tax Analysts v. I.R.S.* ................................................................................30
117 F.3d 607 (D.C. Cir. 1997)

*Todd v. U.S.* .........................................................................................38
386 F.3d 1091 (Fed.Cir. 2004)

*Tom Doherty Associates, Inc. v. Saban Entertainment, Inc.* .............................................37
60 F.3d 27 (2d Cir.1995)

*Trudeau v. Fed. Trade Comm'n* ..........................................................................16
456 F.3d 178 (D.C. Cir. 2006)

*U.S. v. Caceres* ......................................................................................................24
440 U.S. 741 (1979)

*U.S. v. Vilar* ..........................................................................................................29
-- F.3d--, 2013 WL 4608948 (2d Cir., Aug. 30, 2013)

*United States v. City of Detroit* ...........................................................................16
329 F.3d 515 (6th Cir. 2003)

*United States v. Testan* ........................................................................................38
424 U.S. 392 (1976)

*Vitarelli v. Seaton* ...............................................................................................24
359 U.S. 535 (1959)

*Statutes*

5 U.S.C. § 552(a)(4)(B) .........................................................................................30

5 U.S.C. § 701 .............................................................................................4, 15, 17

5 U.S.C. § 701(a)(2) ...............................................................................................23

5 U.S.C. § 702 .........................................................................15, 16, 17, 23, 28

5 U.S.C. §706(a) .....................................................................................................23

5 U.S.C. § 706(2)(A) ..............................................................................................23

15 U.S.C. §77t .................................................................................................16, 18

15 U.S.C. §78u .........................................................................................16, 17, 18

15 U.S.C. § 78y ................................................................................17, 18, 21, 31

15 U.S.C. § 78aa ....................................................................................................28

42 U.S.C. § 1983 ....................................................................................................38

28 U.S.C.A. § 1346 ................................................................................................38

Wall Street Reform and Consumer Protection Act .........................................22, 28
("Dodd-Frank Act") H.R. 4173

*Rules*

Enforcement Manual, §2.3.2 ..................................................................................25

Enforcement Manual, §3.3.3.1 ................................................................................27

Enforcement Manual, §3.3.5.2.2 .......................................................................26, 40

Enforcement Manual, §3.3.6.2 ...............................................................................24

*Treatises*

Barth, Caprio & Levine, Guardians of Finance, MIT Press, 2012 .........................32, 33

Gadinis, The SEC and the Financial Industry: Evidence from Enforcement Against Broker-Dealers, 67 ABA Business Lawyer, May 2012 ...............................................31, 32, 33

Report of the Advisory Committee on Enforcement Policies and Practices ................................25
("the Wells Report"), June 1, 1972

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ARJENT LLC and ROBERT P. DEPALO,

                    Plaintiffs,

-against-

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION,

                    Defendant.

Case No.
*ECF Case*

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

Plaintiffs Arjent LLC ("Arjent") and Robert P. DePalo respectfully submit this memorandum of law in support of their motion (the "Motion") for a preliminary injunction suspending the investigation (the "Investigation") of the United States Securities and Exchange Commission (the "Commission") into Arjent and various other entities,[1] pending final resolution of Plaintiffs' claims in this action.

## PRELIMINARY STATEMENT

The Commission's Investigation of Arjent started under a cloud and has dragged on for two years, vainly gathering speed and intensity, while achieving nothing and going nowhere. The Commission has never articulated a clear objective, meaningful boundaries, or any foreseeable end point for the Investigation. Instead the agency has provided a series of constantly shifting rationales for its search, with new reasons given whenever it becomes clear that the old ones are implausible. The Commission's determination to find any shred of wrongdoing raises serious concerns about whether the true mission of the Investigation is one of

---

[1] The Investigation is titled *In the Matter of Arjent LLC*, Commission File No. NY-8652.

1

truth-seeking, or one of baseless punishment. The aimless tenacity of the Investigation, coupled with Commission staff ("Staff")'s palpable prejudgment of Arjent, often convey the impression that Commission has closed its mind to the possibility that (as is the case) Plaintiffs have not done anything wrong. The Commission rather seems intent on bringing Arjent down by any means possible – including, if necessary, death by Investigation.

The tack the Commission has taken in its Investigation of Arjent follows an arc that has become lamentably familiar: small broker-dealers, who lack the resources and influence to put up a fight, bear the disproportionate brunt of the agency's wrath; while large firms with government ties and deep legal teams are able to avoid the same level of scrutiny. Recent studies conducted into the SEC's investigation and prosecution of small and large financial firms show that, even controlling for the type of violation and size of disgorgement ordered, small firms (and their individual employees) are routinely treated more harshly than their peers at major investment banks. This disparity in treatment is alarming, statistically significant and, apparently, intentional. Small broker-dealers represent low-hanging fruit to SEC investigators. Under pressure to shore up the agency's image in response to scandals that have recently blighted the financial industry, it is easier for investigators to steamroll minor players who cannot fight back, than to target big game capable of defending itself. The Commission's disproportionately harsh treatment of small broker-dealers like Arjent lacks any rational basis, and thus violates the Equal Protection clause of the Fourteenth Amendment.

The Investigation has also been marked by foul play and rule-bending from the outset. Staff initiated the Investigation under cover of a routine field examination (the "Examination"). Even after the Investigation had been formally launched, its existence was concealed from Plaintiffs, and the Commission used Staff examiners rather than Staff investigators to interview

2

Plaintiffs under a false pretense of informality and routine inquiry. Plaintiffs' requests for copies of investigative orders were needlessly rebuffed. The Commission called investors in certain of the investigated entities before any formal order of investigation had been issued. In all of these instances, the Commission abused its discretion by violating its own rules and regulations.

The Commission has had two years and a wealth of documents before it to investigate the alleged misconduct it set out to uncover. Its Staff has been provided with virtually all of the documents sought in their initial requests. And yet the Commission has not issued any Wells letter relating to its Investigation, or found anything on which to construct a case against Arjent. As the Commission's theories of wrongdoing wither in view of the facts, it has merely resorted to more intense harassment.

Several months ago, it issued new subpoenas on Arjent and various other entities under Investigation, seeking vastly delimited categories of documents, going back more than twice as far in time. The Commission has not provided any persuasive justification for the overwhelming breadth of these new requests. The Commission continues to aggressively interview investors in the investigated entities, making thinly veiled and baseless insinuations to these investors that Plaintiffs have misappropriated their funds. The Commission continues to exceed the limits of its own jurisdiction by requesting documents relating to extraterritorial transactions that the agency, as a matter of law, is not empowered to investigate. And after its first efforts to reach these documents were withdrawn before the Court during subpoena enforcement proceedings, the Commission sought to skirt its judicial posture by requesting the same documents indirectly, via the United Kingdom Financial Conduct Authority ("FCA"). To induce the FCA to cooperate, the Commission has made misrepresentations regarding its own authority to

unilaterally withhold documents under the Freedom of Information Act. These excesses of the Commission's statutory authority should not be allowed to continue unchecked.

Accordingly, Plaintiffs seek injunctive and declaratory relief under the Administrative Procedure Act, 5 U.S.C. §§ 701, *et seq.*, and respectfully request that the Court grant a preliminary injunction suspending the Investigation pending the final resolution of this action.

## STATEMENT OF FACTS

The relevant facts are set forth at length in the accompanying affidavit of Andrew J. Goodman, duly sworn October 16, 2013 and the exhibits annexed thereto (including the affidavits of Robert DePalo), the accompanying affidavit of Joshua Gladtke and the Declaration of Michael Scott Ankers. In sum, Staff misconduct has plagued the Investigation from its earliest phases. The early timeline of the Investigation is somewhat blurred. Although a formal order of investigation (the "Initial FOI") was not issued until November 3, 2011,[2] the Commission appears to have commenced its Investigation of Arjent well before that date, under auspices of an Examination beginning in summer of 2011.[3] Among the Commission Staff participating in the Examination was Mr. Terrence Bohan, supervised by Mr. Steven Vitulano, an Assistant Regional Director for the Commission's New York Regional Office.[4]

The Commission first requested documents from Arjent by letter from Mr. Vitulano dated August 19, 2011 (the "Voluntary Request").[5] The Voluntary Request sought exhaustive documentation regarding three entities – Brookville Fund Managers, Brookville Special Purpose Fund LLC ("Brookville") and Pangaea Trading Partners, LLC ("Pangaea") – that had been

---

[2] *See* Affidavit of Andrew J. Goodman in Support of Plaintiffs' Motion for Preliminary Injunction ("Goodman Aff."), Exh. I.
[3] *See* Goodman Aff., ¶ 3.
[4] *See* Id..
[5] *See* Id., Exh. A.

4

publicly disclosed as outside business activities ("OBA"s) by several Arjent LLC employees.[6] Once the Commission pulled back the curtain of the Examination, announced its Investigation,[7] and ultimately issued subpoenas, it became clear that the focus of the Investigation was virtually identical to that of the Voluntary Request.[8]

Pangaea and Brookville are issuers that Mr. DePalo had reported as OBA's in his routine disclosures to Arjent pursuant to the rules of the Financial Regulatory Authority ("FINRA"). Starting on or around September 30, 2010, Pangaea had conducted a private placement of securities (the "Pangaea Placement").[9] The placement memorandum to prospective investors in the Pangaea Placement disclosed that investor funds were to be used to make payments to Mr. DePalo, in consideration of his contribution of approximately 10% of the equity of the respective parents of Arjent and a United Kingdom broker/dealer Arjent Limited ("Arjent UK") to capitalize Pangaea.[10]   Arjent did not act as a broker or agent for the Pangaea Placement, and did collect any fees from the Pangaea Placement.[11]   In any event, Mr. DePalo has received just a small fraction of the disclosed and authorized payment.   Brookville had conducted a private placement of securities (the "Brookville Placement"), in which Arjent and Arjent UK served as placement agents and received certain fully disclosed commissions.[12]

Notwithstanding the elective nature of the Voluntary Request, Mr. DePalo complied in full, producing copious documents for not only Pangaea and Brookville, but also an entity called

---

[6] *See* Id., pp. 3-4.
[7] *See* Goodman Aff., Exh. I (Initial FOI, announcing investigation into Arjent).
[8] *See* Goodman Aff., Exh. K (collating the first subpoenas issued by the Commission during the Investigation, with demands substantially identical to those in the Voluntary Request).
[9] *See* Id., Exh. B (first memorandum for private placement of Pangaea units).
[10] *See* Goodman Aff., Exh. B, p. 32; Exh. C, p. 33; Exh. D, p. 39.
[11] *See* Id.
[12] *See* Goodman Aff., Exh. E, pp. 11-12.

5

Veritas High Yield Fund, LLC ("Veritas").[13]   Veritas had also conducted a private placement under which Arjent and Arjent UK received fully disclosed commissions.[14]  This included all the placement memoranda, all subscription agreements for each of the placements, all escrow records showing the receipt and disposition of all investment proceeds, including the routing of Pangaea funds to Arjent UK in accordance with the placement memoranda.

In spite of Mr. DePalo's cooperation, Commission examiners redoubled their demands, requesting additional documents such as Mr. DePalo's personal bank statements.[15] Understanding these requests to be contrary to the Commission's own rules as to field examinations, Mr. DePalo declined to produce his personal financial records (except to the extent of demonstrating the flow through of Pangaea funds to Arjent UK).[16]

Nevertheless, the Commission sought more, in unreviewable ways inflicting damage to Plaintiffs.  Starting in or around October, 2011, the Commission began placing calls to Pangaea investors – however it did so without making certain necessary disclosures to the interviewees.[17] On November 4, 2011, Mr. Bohan and Mr. Vitulano appeared unannounced at Arjent's offices and requested a personal meeting with Mr. DePalo.[18]   At this meeting, Staff again tried to persuade Mr. DePalo to provide additional documents, such as his personal bank records.[19]  Staff neither disclosed that the very day before the Commission had issued the Initial FOI (which referenced the Pangaea placement but none of the others), nor in any way indicated that Arjent was, at that point, under formal Investigation.[20]   To the contrary, the Commission took pains to

---

[13] *See* <u>Goodman Aff.</u>, ¶ 7.
[14] *See* <u>Id.</u>, Exh. Y, pp. 11-12.
[15] *See* <u>Goodman Aff.</u>, Exh. F, ¶¶ 30-32.
[16] *See* <u>Goodman Aff.</u>, Exh. G, pp. 2-3.
[17] *See* <u>Goodman Aff.</u>, ¶ 9; <u>Affidavit of Joshua Gladtke</u> ("Gladtke Aff."), ¶ 3.
[18] *See* <u>Goodman Aff.</u>, Exh. F, ¶¶ 31, 33.
[19] *See* <u>Id.</u>
[20] *See* <u>Id.</u>

6

prevent Mr. DePalo from learning of the Investigation, dispatching Mr. Bohan with Mr. Vitulano – neither of whom were authorized under the Initial FOI to conduct the Investigation but were familiar to Mr. DePalo as part of the Examination – to attend the November 4, 2011 meeting.[21] Believing that this meeting was taking place in the course of the Examination, Mr. DePalo agreed to speak with Mr. Bohan and Mr. Vitulano in the absence of counsel.[22]

Commission Staff continued to attempt to interview Mr. DePalo under cover of the Examination, in the absence of counsel, for another two weeks.[23]   Certain remarks made by agency examiners betray their awareness that the Investigation was underway.  For example, Mr. Bohan reached out to Mr. DePalo again on November 5, 2011, one day after his undisclosed visit to Arjent's offices, to insist again that Mr. DePalo turn over the personal documents that Staff had requested.[24]   After Mr. DePalo again demurred, Mr. Bohan advised Mr. DePalo that the SEC would have the requested documents within six months and warned Arjent's Chief Compliance Officer about the "next shoe dropping."[25]   Arjent ultimately received a copy of the Initial FOI on November 17, 2011,[26] but only after counsel directly inquired whether an FOI had issued.

In March through May of 2012, the Commission issued its first round of subpoenas (the "First Subpoenas").[27]  The First Subpoenas were served on additional entities besides Arjent, but were otherwise almost entirely duplicative of the Voluntary Request – reinforcing the sense that

---

[21] See Id.; Goodman Aff., Exh. I, p. 2, § 3 (portion of Initial FOI designating officers authorized to take testimony in connection with Investigation).
[22] See Goodman Aff., Exh. F, ¶¶ 31, 33.
[23] See Goodman Aff., ¶ 13.
[24] See Goodman Aff., Exh. F, ¶¶ 31.
[25] See Id.
[26] See Goodman Aff., Exh. J (letter request in response to which the Commission shared the Initial FOI).
[27] See Goodman Aff., Exh. K.

the Commission's Examination was in fact camouflage for its Investigation.[28]   The Commission refused to withdraw those portions of its subpoenas that were redundant with the Voluntary Requests in response to objections made by Plaintiffs; this Court subsequently held that Plaintiffs should not be required to produce documents they had already provided.[29]   Similarly, although the Commission insisted on subpoenaing the personal financial records of Mr. DePalo's wife, the Court thereafter also quashed these demands on grounds that they violated the Right to Financial Privacy Act.[30]   The subpoenas also sought production of extensive documentation from Arjent UK.

In June of 2012, Mr. Vitulano and Mr. Bohan requested a meeting at the Commission's New York Regional Office, purportedly to alleviate Mr. DePalo's concerns of investigative misconduct and bias during the Examination and early phases of the Investigation.[31]   Mr. DePalo attended this meeting accompanied by his undersigned counsel, but the events of the conference only heightened Plaintiffs' concerns.[32]   At the meeting, Mr. Bohan, who stated that he had been instructed by his superior to remain silent during the discussion, nevertheless volunteered that he had continued to press Mr. DePalo for documents after commencement of the Investigation because he wanted to "give Mr. DePalo the opportunity to exonerate himself."[33]   Mr. Bohan's choice of words confirmed what Plaintiffs suspected – that Mr. Bohan had pre-judged Mr. DePalo of wrongdoing even prior to the formal Investigation.   Why else would he need, in Mr. Bohan's words, "to exonerate himself?"

---

[28] *Cf.* Goodman Aff., Exh. A.
[29] *See* Goodman Aff., Exh. M, p. 42:6-8.
[30] *See* Goodman Aff., Exh. N, pp. 10-13.
[31] *See* Goodman Aff., ¶ 20.
[32] *See* Id.
[33] *See* Id., ¶¶ 20-22.

8

Plaintiffs objected to the scope of the First Subpoenas as beyond the Initial FOI.[34]  The Initial FOI referenced only Arjent and Pangaea.  The First Subpoenas also nevertheless sought extensive documents as to, among others, Brookville and Veritas.

Reflexively, the Commission merely expanded the scope of the investigation, refusing to disclose any particulars to Arjent despite appropriate requests.  SEC attorney Mona Akhtar wrote Plaintiffs' counsel on September 19, 2012, transmitting new subpoenas (the "Second Subpoenas")[35] promulgated pursuant to this new order of investigation (the "Amended FOI").[36] The Second Subpoenas, essentially identical to the First Subpoenas, were reissued along with the Amended FOI only to overcome Plaintiffs' objections.[37]  However, because Ms. Akhtar did not enclose a copy of the Amended FOI with her letter attaching the Second Subpoenas, there was no way for Plaintiffs to ascertain whether their objections had actually been addressed.[38] Accordingly, Plaintiffs' counsel requested a copy of the Amended FOI immediately upon receipt of Ms. Akhtar's September 19, 2012 letter.[39]  Plaintiffs' requests for the Amended FOI were made on behalf of Arjent, which had been served with a subpoena in the Investigation, and thus conformed to the guidelines established for such requests in the Commission's Enforcement Manual.[40]  Nonetheless, Ms. Akhtar flatly denied the requests without any explanatory rationale, and blithely referred Plaintiffs' counsel to the Enforcement Manual.[41]  Instead of providing the Amended FOI to afford the parties an opportunity to resolve objections without judicial intervention, on November 14, 2012, the Commission filed an application to compel compliance

---

[34] *See* Id., Exh. O.
[35] *See* Goodman Aff., Exh. P.
[36] *See* Goodman Aff., Exh. R.
[37] *Compare* Goodman Aff., Exh. K *with* Goodman Aff., Exh. P.
[38] *See* Goodman Aff., Exh. Q, p. 2 (letter from Ms. Akhtar advising counsel that Amended FOI could be sent upon request).
[39] *See* Goodman Aff., Exhs. S, T.
[40] *See* Id.
[41] *See* Goodman Aff., Exh. U, p. 1.

9

with the Second Subpoenas.  It was during this proceeding that the Court ruled that Plaintiffs need not produce further copies of documents previously provided to the Commission, and during which the SEC withdrew its request for documents outside the United States.

The Commission's litigation counsel finally provided a copy of the Amended FOI on November 19, 2012.  Plaintiffs made further production pursuant to the Amended FOI and the Court's order.  By the end of March 2013, the Commission had received: (a) all of the private placement memoranda; (b) all of the subscription agreements for every private placement; (c) the complete financial records of each of the issuers; (d) the complete escrow records for each placement, showing the receipt and disbursements of all investor funds; (e) all of Arjent's financial records form 2009 on, including is general ledger, audits and the auditor's work papers; (f) all of Mr. DePalo's personal banking records (on direct subpoena to the bank); and (g) Mr. DePalo's W-2s and 1099s dating back to 2008.

The investigation, however, drags on.  The Commission issued new subpoenas to Plaintiffs and other entities and individuals on June 4, 2013.[42]  These new demands go far beyond the Commission's initial subpoenas, seeking virtually every business record and email in Plaintiffs' possession going back to the beginning of 2007, without regard for whether those records refer or relate to any matter under Investigation.[43]  Moreover, these demands bear no relation to what the Commission represented to the Court was the purpose of the Investigation, in proceedings to enforce its initial subpoenas in November of 2012 – i.e. to determine whether Mr. DePalo had misappropriated investor funds from the Pangaea, Brookville and Veritas Placements.[44]  These offerings took place from 2010 through 2012, and Commission

---

[42] See, e.g., Goodman Aff., Exhs. W, Z (June 4, 2013 subpoenas on Arjent and SPK Partners, respectively).
[43] See Goodman Aff., Exh. W, p. 4, ¶ (A)(1); Exh. Z, p. 4, ¶ (A)(1).
[44] See Goodman Aff., Exh. X, p. 4, ¶ 18.

10

investigators have received all extant documentation related to these transactions.[45]   When Plaintiffs have pointed out the incongruity between the Commission's new demands and its earlier theory of the Investigation, the Commission has simply backpedaled and offered new theories.[46]

The Commission also continues to contact Pangaea investors.[47] The tone of its communications has, if anything, become even more misleading and alarming over the course of the Investigation.[48]  The expected outcome – if not the purpose – of these calls is to damage Arjent's credibility and try to induce investors to implicate Mr. DePalo.  As set forth in the Anker Declaration and Gladtke Affidavit, during these phone calls, the Commission Staff essentially accused Mr. DePalo of taking Pangaea investor funds to which he was not entitled. These could only have been knowing and intentional misstatements, since the Commission already had in its possession the Pangaea memorandum, all of Pangaea's financial records and Mr. DePalo's bank accounts which demonstrate: (a) that Mr. DePalo contributed equities to Pangaea; (b) that he was to be paid a portion of investor proceeds in consideration for this contribution; (c) that this was fully disclosed in the placement memorandum; (d) the placement memorandum  annexed audited financial statements of both entities whose equity Mr. DePalo contributed to Pangaea; and (e) in fact, Mr. DePalo had been paid only a small percentage of the consideration for his contribution.   Plaintiffs are afforded no opportunity whatsoever to administratively challenge these calls, as they are not made pursuant to subpoenas or formal process of any kind.

---

[45] *See* Goodman Aff., Exh. B, p. 1 (Pangaea PPM first released on September 30, 2010); Exh. E, p. 1 (Brookville PPM released January 17, 2011); Exh. Y, p. 1 (Veritas PPM release July 25, 2011); Exh. K (First Subpoenas requesting documents, from all subpoenaed entities, from 2009 through present, for these three offerings).

[46] *See* Goodman Aff., ¶¶ 30, 36, 37.

[47] *See* Goodman Aff., ¶ 39; Declaration of Michael Scott Ankers ("Ankers Decl."), ¶ 3.

[48] *See* Ankers Decl., ¶¶ 3-5.

Further, although the Commission lacks jurisdiction to investigate securities transactions occurring outside of the United States prior to July of 2010, the Commission has attempted to sidestep this limitation at every turn in this investigation. Despite having withdrawn its request for foreign documents before the Court in its application to compel, the Commission nevertheless is still endeavoring to obtain documents related to the pre-2010 activities of Arjent UK, a broker-dealer operating exclusively in the United Kingdom under the jurisdiction of the FCA.[49] The Commission has attempted to enlist the assistance of the FCA to obtain documents from Arjent UK.[50] On June 4, 2013 – the same date the Commission issued its most recent subpoenas to Plaintiffs and other domestic entities – Arjent UK received a letter from the FCA attaching a list for 34 categories of documents, including every scrap of financial information and all Arjent UK documents going back to 2007.[51] The letter states that it was sent upon request of "an overseas regulator," and it is obvious from the substance of the demands that they were promulgated at the Commission's behest.[52] In subsequent conversations with Arjent UK and its counsel, the Commission Staff has come forward and conceded that it is the requesting agency.

Arjent UK has voiced concerns that it may be subject to criminal liability under the UK Data Protection Act if the documents are publicly disclosed under the U.S. Freedom of Information Act ("FOIA").[53] The Commission has falsely represented to the FCA that the

---

[49] *See* <u>Goodman Aff.</u>, Exh. W, p. 10, Requests 1, 8, 10-15, 17, 18, 20-30.
[50] *See* <u>Goodman Aff.</u>, Exh. FF.
[51] *See* <u>Id.</u>
[52] *See* <u>Id.</u>
[53] *See, e.g.*, <u>Goodman Aff.</u>, Exh. GG.

12

Commission could unilaterally "exempt" any documents shared between the agencies from FOIA disclosure.[54]  In truth, the ultimate FOIA determination rests with the Courts.

Arjent UK has also raised concerns as to the extreme burdensomeness of such a broad request going back seven years to January 2007.[55]  In response – and alleging a relevance different than that proffered to this Court in its application to compel production – the Commission took the position that 2007 and 2008 are rendered relevant by an offering of an entity known as SPK Partners ("SPK").  But the Commission already has in its possession the SPK placement memorandum, all SPK's financial records and each and every SPK subscription agreement.[56]  These documents demonstrate that all sales of SPK securities occurred outside of the United States well prior to July 2010, and are thus outside the Commission's jurisdiction.[57]

Plaintiffs have repeatedly complained to the Commission's Inspector General and senior management, all to no avail.[58]  Rather, SEC retaliation was the only result of each complaint.[59]

This action, of necessity, follows.

---

[54] *See* Goodman Aff., ¶¶ 50-51.
[55] *See* Goodman Aff., Exh. GG, pp. 7-8.
[56] *See* Goodman Aff., ¶ 46.
[57] *See* Id.
[58] *See, e.g.*, Goodman Aff., Exhs. HH, II.
[59] *See, e.g.*, Goodman Aff., Exhs. JJ, KK.

## ARGUMENT

A party seeking a preliminary injunction under FRCP Rule 65 "must demonstrate (1) irreparable harm absent injunctive relief; (2) either a likelihood of success on the merits, or a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in the plaintiffs favor; and (3) that the public's interest weighs in favor of granting an injunction." *Metro. Taxicab Bd. of Trade v. City of N.Y.*, 615 F.3d 152, 156 (2d Cir.2010) (internal citation and quotation marks omitted).

## POINT I

## PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

**A.     Subject Matter Jurisdiction Exists Under § 1331**

To establish subject matter jurisdiction under § 1331, a plaintiff must assert claims arising under the Constitution or "Laws of the United States." *Empire Healthchoice Assur., Inc. v. McVeigh*, 547 U.S. 677, 678 (2006) ("[a] case 'aris[es] under' federal law within the meaning of § 1331 . . . if 'a well-pleaded complaint establishes either that federal law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law.'") (citation omitted). The Supreme Court has also held that, subject only to preclusion-of-review statutes, district court jurisdiction to review agency action is conferred by § 1331. *See Califano v. Sanders*, 430 U.S. 99, 104-07 (1977).

This action presents two questions for declaratory judgment and injunctive relief: (1) whether the Commission is violating Plaintiffs' equal protection rights by treating small broker/dealers and their employees differently from large firms[60] and (2) whether the Commission's conduct of its investigation constitutes an abuse of discretion and arbitrary and

---

[60] *See* Complaint, ¶¶ 80-82.

14

capricious conduct within the meaning of the Administrative Procedure Act ("APA"), 5 U.S.C. §§701 *et. seq.*[61] This Court therefore has subject matter jurisdiction.

## B.  Sovereign Immunity Has Been Waived By APA § 702

Section 702 of the APA provides in pertinent part:

> A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party. . . . Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.

A consistent body of case law applying § 702 holds that sovereign immunity is waived for "complaints [seeking] declaratory and injunctive relief," because they are "certainly not actions for money damages." *Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988). *See also Sharkey v. Quarantillo*, 541 F.3d 75, 91 (2d Cir. 2008) ("Section 702 of the APA waives the federal government's sovereign immunity in actions [for non-monetary relief against an agency] brought under the general federal question jurisdictional statute.") (citation and quotation marks omitted); *Raz v. Lee,* 343 F.3d 936, 938 (8th Cir. 2003) (same); *Presbyterian Church (U.S.A.) v. United States,* 870 F.2d 518, 524-25 (9th Cir. 1989) (same).

Consistent case law further teaches that "the APA's waiver of sovereign immunity applies to any suit whether under the APA or not" because § 702 "waives sovereign immunity

---

[61] *See* Id., ¶¶ 78, 79.

NY_DOCS:619282.5

for [any] action in a court of the United States seeking relief other than money damages, not [solely] for an action brought under the APA." *Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 186 (D.C. Cir. 2006) (citation, quotation marks, and alterations omitted). *See also Up State Federal Credit Union v. Walker*, 198 F.3d 372, 375 (2d Cir. 1999) (unless exceptions in last sentence of § 702 apply, "the APA does create a general waiver of sovereign immunity as to equitable claims against government agencies"); *Commonwealth of Puerto Rico v. United States*, 490 F.3d 50, 57-58 (1st Cir. 2007) ("This waiver is for '*all* equitable actions for specific relief against a Federal agency . . . ,' and thus 'applies to any suit whether under the APA or not.'") (quoting *Trudeau*, 456 F.3d at 186)); *United States v. City of Detroit*, 329 F.3d 515, 520-21 (6th Cir. 2003) (en banc) (holding that "the waiver of sovereign immunity in section 702 [applies] in cases brought under statutes other than the APA" and noting that five other circuits have so held). This reading is supported by the legislative history of § 702 (as described by *Trudeau*, 456 F.3d at 186-87):

> [T]he Senate Report [on the 1976 amendment] plainly indicated that Congress expected the waiver to apply to non-statutory actions, and thus not only to actions under the APA. "The committee does not believe," the Report stated, that the amendment's "partial elimination of sovereign immunity, as a barrier to *non-statutory review* of Federal administrative action, will create undue interference with administrative action." S. REP. NO. 94-996, at 8, 1976 U.S. Code Cong. & Ad.News, at 6129.

Here, the Commission purported to commence investigations under §20 of the Securities Act (15 U.S.C. §77t) and §21 of the Exchange Act (15 U.S.C. §78u). Neither of these sections contains any limitation on judicial review.

Nevertheless, in 1983 the Second Circuit in *Sprecher v. Graber*, 716 F.2d 968 (2d Cir. 1983) held that the APA did not waive sovereign immunity for suits challenging SEC

16

investigations, because historically the sole procedure for challenging a Commission investigation under Exchange Act §21 had been in opposition to an SEC judicial application to compel subpoena compliance under §21(c). The Court concluded that §702's waiver of sovereign immunity did not apply because §21(c) was a "statute[] that preclude[d] judicial review" under §701. The *Sprecher* panel reasoned

> "[w]hile the existence of dual and non-exclusive proceedings to challenge [the validity of SEC investigations and subpoenas] is not unthinkable, it is sufficiently anomalous and disruptive of existing practice for us to call for some specificity of purpose to that end on Congress's part. No such purpose is evident." 716 F.2d at 975.

As such, the *Sprecher* Court held that, since the APA did not expressly overturn prior case law construing the subpoena enforcement proceeding of §21(c) as an exclusive remedy, the Court would not infer an intent by Congress to depart from this rule. In essence, *Sprecher* applied a presumption against non-exclusive remedies for agency action, concluding that the facially neutral provisions of §21(c) would be deemed exclusive absent a clear statement to the contrary.

The Supreme Court's holding in *Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*, ___ U.S. ___, 130 S.Ct. 3138 (2010) vitiates the Circuit's rationale. The *Free Enterprise* plaintiffs challenged an adverse ruling by the Public Company Accounting Oversight Board ("PCAOB"), arguing the constitutionality of the Board *ab initio*. Relying, *inter alia*, on a presumption against dual non-exclusive remedies posited by *Sprecher* and its progeny, the Government argued that the plaintiffs fell without the scope of the §702 sovereign immunity waiver because Exchange Act §25 provided an exclusive process for judicial review of any adverse ruling. The Supreme Court rejected this argument, holding instead that "provisions for agency review do not restrict judicial review unless the statutory scheme displays a fairly

17

discernible intent to limit jurisdiction, and the claims at issue are of the type Congress intended to be reviewed within the statutory structure." *Id.* at 3150 (internal quotation marks and brackets omitted). Thus, the High Court precisely flipped the *Sprecher* presumption on its head: this language in *Free Enterprise* compels a presumption of non-exclusive review unless there is evidence of Congressional intent to the contrary. Accordingly, *Sprecher* is no longer good law.

Although *Free Enterprise* was decided under Exchange Act §25, it applies with equal vitality to Exchange Act §21 and Securities Act §20. The Supreme Court significantly reasoned in *Free Enterprise* that §25 was not an exclusive remedy for review of PCAOB action because §25 "provides only for judicial review of *Commission* action, and not every Board action is encapsulated in a final Commission order or rule." 130 S.Ct. at 3150. Indeed, the *Free Enterprise* Court noted that the PCAOB's investigation of one of the plaintiffs did not result in any sanction, and the review of another resulted in an uncomplimentary report that was not a reviewable "final order" under §25. *Id.* at 3150.

Likewise, although Exchange Act §21 and Securities Act §20 build in judicial review as a pre-requisite to compelling investigatory compliance, numerous investigative activities do not involve subpoenas or Commission orders. This case is replete with examples: concealing the FOI thereby denying Plaintiffs a meaningful right to counsel;[62] investigation by Commission Staff not authorized under the FOI;[63] acting outside the scope of SEC jurisdiction;[64] misrepresentations by Staff to investors and foreign enforcement authorities.[65] Each of these would be outside the scope of judicial review were Plaintiffs limited to the relief available through Exchange Act §21 and Securities Act §20.

---

[62] *See* Goodman Aff., Exh. F, ¶¶ 31, 33.
[63] *See* Id., *See* Goodman Aff., Exh. I, p. 2.
[64] *See* Goodman Aff., Exh. W, p. 4, ¶ (A)(1); Exh. Z, p. 4, ¶ (A)(1); Exh. FF.
[65] *See* Goodman Aff., ¶¶ 9, 50-51; Ankers Decl., ¶¶ 3-5.

18

In addition to reversing the presumption in *Sprecher*, *Free Enterprise* defines the factors that Courts consider in determining whether Congress has intended to limit claims to agency review:

> Generally, when Congress creates procedures designed to permit agency expertise to be brought to bear on particular problems, those procedures are to be exclusive.   But we presume that Congress does not intend to limit jurisdiction if a finding of preclusion could foreclose all meaningful judicial review; if the suit is wholly collateral to a statute's review provisions; and if the claims are outside the agency's expertise.

130 S.Ct. at 3150 (internal quotation marks and citations omitted).   Plaintiffs here meet each element of the *Free Enterprise* test.

A finding that this case is precluded by sovereign immunity would foreclose all meaningful judicial review.   This is not a question of review of the ultimate outcome of any proceeding that the Commission may file; nor is this a question of enforcing subpoenas.   Rather, at bar is a pattern of conduct that totally escapes scrutiny absent this case.   Without judicial relief herein: there is, for example no remedy for the Commission's misrepresentations to the FCA regarding the SEC's supposed unilateral ability to protect confidentiality against a FOIA request;[66] there is no remedy for the Staff's defamatory statements to investors;[67] there is no remedy against the Commission's violation of its own procedures in concealing the FOI thereby depriving Plaintiffs of counsel, or in permitting investigation by Staff not authorized by the FOI;[68] there is no remedy for the damage caused by the Commission's acting in patent excess of its jurisdiction.[69]   The Commission has had two years to conduct an investigation, but yet has filed no charges nor even issued a Wells letter.   Rather it seeks relief by indirection – harassing

---

[66] *See* Goodman Aff., ¶¶ 50-51.
[67] *See* Id., ¶ 9; Ankers Decl., ¶¶ 3-5.
[68] *See* Goodman Aff., Exh. F, ¶¶ 31, 33; Exh. I, p. 2.
[69] *See* Goodman Aff., Exh. FF.

Plaintiffs to professional death – what it apparently is unwilling to do within the requisite administrative process. Plaintiffs welcome any opportunity to defend themselves on the substance in accordance with due process and adjudicatory procedures. But unless the Commission's harassment is stopped, Plaintiffs may not professionally live to see that day. Absent this lawsuit, there is no way to obtain judicial review of that part of the investigation that does not involve subpoenas.

In fact, Plaintiffs have repeatedly tried without success to have the Commission assure that its Staff acted properly. On October 12, 2012, Plaintiffs filed a complaint with the SEC's Inspector General highlighting the SEC staff misconduct known to that time.[70] This misconduct included concealment of the existence of the FOI despite interviewing Mr. DePalo in the absence of counsel, refusal to provide copies of an Amended FOI and harassment of customers with misrepresentations regarding Mr. DePalo.[71] Plaintiffs received no response. Accordingly, by letter dated September 16, 2013, Plaintiffs' counsel wrote to the Commission's General Counsel, and the senior personnel at the Division of Enforcement, Office of Ethics Counsel, the Office of International Affairs and the Inspector General, providing copies of the October 12, 2012 complaint and describing subsequent Staff misconduct such as: (a) acting in excess of its jurisdiction by harassing a foreign broker/dealer for information on pre-July, 2010 private sales wholly outside the United States; (b) in the course of this effort, misrepresenting to the Financial Control Authority ("FCA") of the United Kingdom the Commission's authority to exempt from Freedom of Information Act (FOIA") production documents protected by UK law from public disclosure; and (c) continuing to harass investors with misstatements regarding Mr. DePalo.[72]

---

[70] See Goodman Aff., Exh. HH.
[71] See Id.
[72] See Goodman Aff., Exh. II

20

The only response was a transparently retaliatory demand the following Monday, imposing yet additional significant expense on Plaintiffs.[73]

Similarly, the issues here at bar are wholly collateral to the statutory review procedures. Post *Free Enterprise* cases define challenges to the process, rather than to the outcome, as "wholly collateral" to statutory review procedures. *Gupta v. S.E.C.*, 796 F.2d 503 (S.D.N.Y. 2011)(equal protection challenge to administrative hearing process under Exchange Act §25 held "wholly collateral" to whether plaintiff was guilty of charges against him); *Elk Run Coal Comp., Inc. v. Department of Labor*, 804 F.Supp.2d 8 (D.D.C. 2011)(challenge to process of approving mine safety plans held "wholly collateral"). Conversely, challenges to ultimate determinations are not collateral. *Compare Altman v. S.E.C.*, 768 F.Supp. 2d 554 (S.D.N.Y. 2011), *aff'd.*, 687 F.3d 44 (2d Cir. 2012)(attorney's challenge to S.E.C.'s disbarment ruling held not collateral); *Cleantech Innovations, Inc. v. NASDAQ Stock Market*, 2011 WL 7138696 (S.D.N.Y. 2011), *adhered to*, 2012 WL 345902 (S.D.N.Y. 2012)(after delisting, plaintiff's District Court challenge held not to be collateral).

Here, Plaintiffs challenge no outcome or determination whatsoever. The Commission has not yet even issued a Wells letter, let alone filed any charges, despite a two year investigation (during some of which, the Commission had untrammeled access to the records of Arjent LLC, conducting a purported field exam without disclosing the FOI).[74] Rather, as in *Gupta, supra.* and *Elk Run, supra.*, -- in stark contrast to *Altman, supra.* and *Cleantech, supra.*-- the Plaintiffs here challenge the process itself (on equal protection and APA grounds), which is not otherwise reviewable.

---

[73] *See* <u>Goodman Aff.</u>, Exhs. JJ, KK.
[74] *See* <u>Goodman Aff.</u>, ¶¶ 3-15.

21

As well, there is nothing here at bar peculiar to the Commission's expertise.  As Judge Rakoff noted in *Gupta, supra.,* "it would be inherently difficult for the Commission" to be reviewing the propriety of its own conduct.  796 F.2d at 512.  Equal protection was there at issue, as it is in this case, and "administrative expertise is not implicated where a constitutional violation is alleged, because such allegations are particularly suited to the expertise of the judiciary."  *Id.* citing *Adkins v. Rumsfeld,* 389 F.Supp.2d 579, 588 (D.Del. 2005).  *See also Free Enterprise, supra.*

In addition to the inherent difficulty of reviewing its own conduct and constitutional issues, the elements of the APA claim are without the Commission's expertise.[75]  For example, an APA issue is that the Commission is acting outside its jurisdiction by inquiring into 2007-2008 private sales of non-listed (SPK) securities wholly outside the United States.  Courts have held that such jurisdictional claims are not within the SEC's expertise.  *Gupta, supra.,* 796 F.2d at 512 (claims of "allegedly improper retroactive application of Dodd-Frank Act are not peculiarly within the SEC's competence or expertise").  Plaintiffs also challenge the Commission's representation to the FCA that the SEC can effectively exempt documents from FOIA disclosure.  In truth the final say (absent certain representations by the FCA) rests with the courts, which have consistently held that agencies lack expertise in interpreting FOIA.  *New York Public Interest Research Group v. U.S. E.P.A.,* 249 F.Supp.2d 327, 337 (S.D.N.Y.2003) (requiring agency disclosure of documents in spite of confidentiality agreement entered between agency and regulated entity); *Burnside-Ott Aviation Training Center, Inc. v. U.S.,* 617 F.Supp. 279, 286 (S.D.Fla.1985) (although regulated entity that provided information to agency "argues that the information to be released in this case is cloaked by the agency's specific contractual

---

[75] These are discussed in detail in point I(C) *infra.*

22

promise of confidentiality, the FOIA does not permit agencies to alter its provisions by private promises"); *Save the Dolphins v. U. S. Dept. of Commerce*, 404 F.Supp. 407, 411 (N.D.Cal.1975) (if agency assurances of privacy were enforced, "an agency, by handing out promises of confidentiality, could undermine the [FOIA's] guarantee of *de novo* judicial review as to whether a record is being improperly withheld. Accordingly, the promise of confidentiality given by [the agency] does not shield the film from the disclosure requirements of the Freedom of Information Act").

Accordingly, under the *Free Enterprise* test, this action falls within the 5 U.S.C. §702 waiver of sovereign immunity.

**C.    The Claims Are Likely To Succeed**

5 U.S.C. §706(a) states in pertinent part that:

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall--

**(2)** hold unlawful and set aside agency action, findings, and conclusions found to be--

**(A)** arbitrary, capricious, an abuse of discretion,[76] or otherwise not in accordance with law;

**(B)** contrary to constitutional right, power, privilege, or immunity;

**(C)** in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

**(D)** without observance of procedure required by law;

---

[76] §706(2)(A) granting courts authority to void an abuse of discretion is in tension with §701(a)(2), which states that the APA does not apply to "agency action committed to agency discretion by law."  To resolve this tension, Courts narrowly construe the meaning of exemptive discretion to matters based on considerations of "social, economic, and political" public policy. *Berkovitz v. U.S.*, 486 U.S. 531, 537-538 (1988).

Here, the Commission has hit a grand slam: acting contrary to its own procedures, outside of its jurisdiction, in an arbitrary and capricious abuse of its discretion, and in violation of Plaintiff's constitutional equal protection rights.

### 1. The Commission Has Acted Contrary To Its Own Rules and Regulations; and Without Observance of Procedure Required By Law

"Where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures. This is so even where the internal procedures are possibly more rigorous than otherwise would be required." *Morton v. Ruiz*, 415 U.S. 199, 235 (1974) citing *Service v. Dulles*, 354 U.S. 363 (1957)(which reversed termination of federal government employee for failure to follow procedural rules) and *Vitarelli v. Seaton*, 359 U.S. 535 (1959).

> Agency violations of their own regulations, whether or not also in violation of the Constitution, may well be inconsistent with the standards of agency action which the APA directs the courts to enforce. Indeed, some of our most important decisions holding agencies bound by their regulations have been in cases originally brought under the APA. (Citations omitted)

*U.S. v. Caceres*, 440 U.S. 741, 754 (1979).

From the very outset here, the Commission has violated its own rules. During a field exam (before any FOI), Terence Bohan of the Commission's staff demanded that Mr. DePalo produce personal financial records,[77] even though "the Exchange Act does not require employees of brokerage firms to cooperate with inquiries into the employee's individual conduct." Securities and Exchange Commission, Division of Enforcement, Enforcement Manual (hereinafter "Enforcement Manual") §3.3.6.2. Nevertheless, Mr. Bohan's increasingly vituperative demands for personal information hit a crescendo on November 5, 2011, when he told Arjent's Chief Compliance Officer that Mr. DePalo "was not going to like it when the next

---

[77] *See* Goodman Aff., Exh. F, ¶¶ 30-32.

24

shoe dropped."[78]   Unbeknownst to Plaintiffs, the FOI had issued the prior day, November 3,

2011.[79]

Thus apparent is that the FOI issued as a fishing expedition for personal information.

This, too, is contrary to the Commission's own rules.  Opening a formal investigation is a serious

matter.

> Investigations are normally not publicly announced.  Nevertheless,
> the fact that an investigation is in process becomes known, and,
> therefore, the initiation of an investigation may itself operate as a
> sanction. The multiple steps involved in issuing an investigative
> order have developed because of the impact of an investigation on
> the party being investigated. The fact that an investigation has been
> ordered by the Commission itself is frequently interpreted by the
> public as a predetermination by the Commission that the party
> named in the order has violated the law. Almost 40 years of
> repeated  disclaimers  have  not  succeeded  in  erasing  that
> impression.

Report of the Advisory Committee on Enforcement Policies and Practices ("the Wells Report),

June 1, 1972, p. 18.  "During the pendency of an investigation uncertainties are likely to be

created in the minds of the investigatees and those with whom they have business or other

dealings." Id., p. 20.   Therefore, standards for opening an investigation are fairly stringent:

"While the threshold analysis for opening a [Matter Under Investigation ("MUI")] is relatively

low, determining whether the MUI should be converted to an investigation or whether to open an

investigation is typically a more detailed evaluation that is based on additional information."

Enforcement Manual, §2.3.2, p.17.   Here, the investigation was apparently opened to get

"additional information" (Mr. DePalo's personal financial information);[80] and not based on

---

[78] See Goodman Aff., Exh. F, ¶ 31.
[79] See Goodman Aff., Exh. I.
[80] See Goodman Aff., Exh. F, ¶ 31.

25

anything other than personal animus of, and pre-judgment by, a single staff member, Mr. Bohan.[81]

More disturbing, and indeed shocking to the conscience, is the Staff's conduct once the FOI was issued on November 3, 2011. The very next day, on November 4, 2011, Mr. Bohan and his superior Steven Vitulano appeared together at Arjent LLC's offices without prior notice, and met with Mr. DePalo in a continuing effort to coerce him into providing financial records of non-broker/dealers and his own personal financial records.[82] Believing that this was in connection with the ongoing field examination, Mr. DePalo allowed the interview by Messrs. Vitulano and Bohan in the absence of counsel.[83] Unbeknownst to Mr. DePalo – and not disclosed by either Mr. Vitulano or Mr. Bohan – the Commission had issued the FOI the very day before.[84] Since the FOI had already been issued, Mr. DePalo was entitled to counsel in his November 4, 2011 meeting with Messrs. Vitulano and Bohan. Enforcement Manual, §3.3.5.2.2. By failing to disclose the FOI, Messrs. Vitulano and Bohan deprived Mr. DePalo of his right to counsel. Moreover, both Messrs. Vitulano and Bohan violated the FOI, since neither one of them is designated as an officer of the Commission empowered to conduct the investigation.[85] The Commission continued to conceal the FOI until November 17, 2011, a period of two weeks during which the field examination continued unabated, and without Arjent availing itself of counsel.[86]

But the Commission did not stop there. Instead, beginning in October, 2011 – even before the FOI was issued – and then again in or about July, 2013, Commission staff contacted

---

[81] See Goodman Aff., ¶¶ 20-24.
[82] See Goodman Aff., Exh. F, ¶ 33.
[83] See Id., ¶¶ 32, 33.
[84] See Goodman Aff., Exh. I.
[85] See Id., p. 2, § 3.
[86] See Goodman Aff., ¶¶ 12-16.

26

investors in the United Kingdom who had privately purchased unlisted membership interests in Pangaea, a limited liability corporation which is one of Mr. DePalo's reported outside business activities ("OBAs").[87]  First, any calls to investors before the issuance of the FOI *per se* violates SEC rules.  *See* Enforcement Manual, §3.3.3.1, p. 74 (requiring that Staff tell interviewees that an investigation is being conducted to determine whether any rules were violated).

Recognizing the detrimental impact of the very existence of an investigation, the Commission's rules make explicit that interviewees should be told that the information is requested to determine **whether** any violation has occurred, and such inquiries are routine. (emphasis added)  Enforcement Manual, §3.3.3.1, p. 74.  Here, the Staff did just the reverse.  It implied – if it did not outright state – that Mr. DePalo wrongfully took money from Pangaea for personal purposes;[88] thereby disregarding during the conversations with investors the full disclosure made as to the consideration for Mr. DePalo's contribution of equity interests in Arjent LLC and Arjent Ltd. (UK), Pangaea's sole assets.[89]  Indeed, since the Staff has received Pangaea's placement memorandum, it knew full well that any payments to Mr. DePalo were in consideration of this contribution;[90] and, moreover, that Mr. DePalo had taken less than the disclosed price.  Further, the Staff also falsely implied – if it did not actually state *in haec verba* – that Pangaea's portfolio companies had failed, when in fact both were and are fully operational broker/dealers in full compliance with net capital regulations.[91]  In short, far from representing the investigation as a routine process to gather information (as required by the Enforcement Manual), the Staff did everything it could to the contrary, slanderously conveying to investors

---

[87] *See* Goodman Aff., ¶ 9; Gladtke Aff., ¶¶ 3, 4.
[88] *See* Ankers Decl., ¶¶ 3-5.
[89] *See* Goodman Aff., Exh. B, p. 32; Exh. C, p. 33; Exh. D, p. 39.
[90] *See* Id.
[91] *See* Ankers Decl., ¶¶ 3, 5.

27

that violations had in fact occurred and that Mr. DePalo had essentially stolen money.  Not only is this a violation of the SEC's own rules, but it is defamatory.

### 2.    The Commission Has Acted in Excess of Its Jurisdiction

Plenary actions lie to restrain an agency from acting outside the scope of its delegated jurisdiction.  *Leedom v. Kyne,* 358 U.S. 184 (1959).  The SEC has done so here.

Before joining Arjent, a present Arjent registered person, Gregg Lerman ("Lerman") was an officer, director and equity holder of SPK Partners LLC ("SPK").[92]  As is evident in the full disclosure provided to the Commission, neither Arjent LLC nor Mr. DePalo had any involvement whatsoever with SPK.[93]  The membership interests of SPK are not listed on any securities exchange whatsoever.  SPK membership units were sold exclusively outside the United States in 2007 and 2008.[94]  Nevertheless, the Commission staff has demanded, and continues to demand, all documents related to SPK and sales of SPK.[95]

Foreign sales of SPK membership interests before July 2010 are outside the scope of the SEC's jurisdiction.  In *Morrison v. National Australia Bank Ltd*, 561 U.S. __, 130 S.Ct. 2869 (2010), the Supreme Court held that Exchange Act jurisdiction was limited to the purchase or sale of securities in the United States or of securities listed on a domestic exchange.[96]  Reasoning that statutory jurisdictional limits apply to any type of suit brought under that statute's authority,

---

[92] *See* <u>Goodman Aff.</u>, Exh. DD.

[93] *See* <u>Id.</u>

[94] *See* <u>Goodman Aff.</u>, Exhs AA, BB.

[95] *See* <u>Goodman Aff.</u>, Exh. Z.

[96] Shortly after *Morrison*, in July, 2010, Congress passed the Dodd-Frank Act, which, responding to *Morrison*, *inter alia* , expanded Securities Act and Exchange Act jurisdiction to encompass future purchases and sales effectuated by conduct in the United States or having a domestic impact.  *See* 15 U.S.C. § 78aa ("The district courts of the United States and the United States courts of any Territory shall have jurisdiction of an action or proceeding brought or instituted by the Commission or the United States alleging a violation of the antifraud provisions of this chapter involving . . . (2) conduct occurring outside the United States that has a foreseeable substantial effect within the United States") (text added by amendment dated July 21, 2010, Pub.L. 111-203, Title IX, §§ 929E(b), 929P(b)(2), 124 Stat. 1853, 1865 [the "Dodd-Frank Act"]).

the Second Circuit in *U.S. v. Vilar*, -- F.3d--, 2013 WL 4608948 (2d Cir., Aug. 30, 2013), applied *Morrison* to dismiss a criminal securities action to the extent it arose solely from pre-July, 2010 transactions.

For the same rationale, and *a fortiori*, *Morrison* bars civil actions by the Commission for the non-domestic purchase or sale of unlisted securities prior to July 2010. Nevertheless, the SEC continues its pursuit of extensive information regarding SPK. Thus, the SEC has requested the FCA to obtain every single scrap of financial information of a UK broker/dealer, Arjent Limited ("Arjent UK") going back to 2007. The Commission's rationale is that SPK offered shares in 2007 and 2008, even though documents already produced show that Arjent UK had nothing whatsoever to do with SPK in 2007, 2008 or 2009. But regardless, even if it did, any such transaction is outside Commission jurisdiction under *Morrison*.

### 3. The Commission Has Acted in an Arbitrary and Capricious Abuse of its Discretion

"It is, as Justice Cardozo stated long ago, a 'fundamental and unquestioned' principle of our jurisprudence that 'no one shall be permitted to . . . take advantage of his own wrong.' *R.H. STEARNS Co. v. United States*, 291 U.S. 54, 61-62." (Ellipses in original) *Corniel-Rodriquez v. Immigration and Naturalization Service*, 532 F.2d 301 (2d Cir. 1976)(applying governmental estoppel to stay deportation). *See also Immigration and Naturalization Service v. Miranda*, 459 U.S. 14 (1982)(affirmative misconduct may estop government action).

Already exposed is a litany of Commission misconduct: concealing the FOI; denying Plaintiffs the right to counsel;[97] misleading investors to cloud Mr. DePalo's good name and reputation;[98] and acting in excess of its jurisdiction.[99] The list does not end there.

---

[97] *See* <u>Goodman Aff.</u>, Exh. F, ¶ 31-33.
[98] *See* <u>Ankers Decl.</u>, ¶¶ 3-5; <u>Gladtke Aff.</u>, ¶¶ 3, 4.

29

The repetitive and terribly expensive and burdensome nature of the ongoing fishing expedition is set forth in detail in the accompanying affidavits.

Beyond that, the Commission's harassment has now extended to a foreign broker/dealer. The unbelievably burdensome demand issued by the FCA to Arjent UK at the Commission's request includes production of information which if made public would subject Arjent UK to criminal liability under the UK Data Protection Act of 1998 ("DPA").[100]   During a conference call among Arjent UK, its counsel, the FCA and the SEC, Arjent UK's counsel expressed its concern with violating the DPA, and the Commission staff represented that it could on its own authority protect the documents from FOIA disclosure.[101]

This is a blatant misrepresentation. "Congress has made clear both that the federal courts, and not the administrative agencies, are ultimately responsible for construing the language of the FOIA." *Public Citizen Health Research Group v. Food and Drug Admin.,* 704 F.2d 1280, 1287 (D.C.Cir. 1984).  While the SEC may attempt to defend a decision to withhold documents against a judicial challenge, the agency bears the burden of proof on this issue. *See* 5 U.S.C. § 552(a)(4)(B).  The SEC's determination is not entitled to deference, as FOIA clearly states that judicial review takes place *de novo. See id.*; *Judicial Watch, Inc. v. Rossotti*, 326 F.3d 1309, 1313 (D.C.Cir. 2003) ("we emphasize that we owe no particular deference to the IRS's interpretation of FOIA"); *Tax Analysts v. I.R.S.*, 117 F.3d 607, 613 (D.C. Cir. 1997) ("[W]e will not defer to an agency's view of FOIA's meaning. . . .  No one federal agency administers FOIA. The meaning of FOIA should be the same no matter which agency is asked to produce its records"); *Save the Dolphins v. U. S. Dept. of Commerce, supra*, 404 F.Supp. at 411.

---

[99] *See* Goodman Aff., Exh. W, p. 4, ¶ (A)(1); Exh. Z, p. 4, ¶ (A)(1); Exh. FF.
[100] *See* Goodman Aff., Exh. GG.
[101] *See* Goodman Aff., ¶¶ 50-51.

30

In an attempt to persuade counsel to advise that there is no DPA problem, the Staff referred to Exchange Act 25(d).  But the Commission's reliance is misplaced.  That section requires the foreign regulator to represent in good faith that disclosure of protected documents would constitute a criminal violation of that country's laws.  That has absolutely nothing to do with what the Commission has the authority to do on its own as misrepresented to the FCA.

### 4. The Commission's Ongoing Regular Practice and Procedure Discriminates Against Small Broker/Dealers Violating the Equal Protection Clause

A recent study by Professor Stavros Gadinis, of the University of California at Berkeley Law School, published in the ABA Business Lawyer, Vol. 67, May, 2012, demonstrates that small broker/dealers (defined as less than 1,000 employees) and their employees regularly suffer unjustifiably harsher treatment at the hands of the Commission on an ongoing basis.  Such is apparently the pattern underlying the Commission's misconduct here.

Strikingly:

> Big-firm defendants are more likely to receive no industry ban or registration revocation: 73 percent of them received only a censure or cease-and-desist order, compared with 45 percent of small-firm defendants.  At the other end of the spectrum, more than one quarter of small-firm defendants were permanently banned from the broker-dealer industry, compared to just 4 percent of big-firm defendants.

Gadinis, The SEC and the Financial Industry: Evidence from Enforcement Against Broker-Dealers, 67 ABA Business Lawyer, May 2012, p. 709 (hereinafter "Gadinis").

Likewise, "40 percent of all enforcement actions against big firms targeted the firm alone without placing any liability on particular individuals, compared to just 10 percent of all small-firm actions." *Id.*, p. 701. "All models confirm that industry bans for big-firm defendants were likely to be disproportionately less severe in comparison to small firm cases." *Id.*, at p. 709.

31

NY_DOCS:619282.5

The Commission's own anecdotal evidence supports Professor Gadinis' conclusions.

> A report from the SEC's own Office of Inspector General noted in 2008 that even when the commission found problems, it did not act. For example, the inspector general found that the Division of Trading and Markets "became aware of numerous potential red flags prior to Bear Stearns' collapse, regarding its concentration of mortgage securities, high leverage, shortcomings of risk management in mortgage-backed securities and lack of compliance consistent with the spirit of certain Basel II standards, but did not take action to limit these risk factors." Continuing, the report emphasized that the Trading and Markets Division in 2006 "identified precisely the types of risk that evolved into the subprime crisis in the US." Yet the SEC did not use its power over the investment banks to induce them to reduce these systematic risks. Furthermore the court-appointed investigator of the causes of the Lehman Brothers bankruptcy reached a similarly harsh conclusion: The report, from Anton Valukas, noted that (1) Lehman regularly exceeded its own risk limits, and (2) the SEC knew about these excesses and yet did nothing.

Barth, Caprio & Levine, <u>Guardians of Finance</u>, MIT Press, 2012, pp. 102-103.

"Perhaps even more important than ignoring excessive risk-taking, the SEC publicly argued that it was doing an effective job of supervising the large investment banks." *Id.*, p. 103.

This relates to one of Professor Gadinis' other findings:

> 59 percent of cases against small firms or their employees ended up in court, compared to 29 percent of big-firm cases. Since sending a firm to court might have significant negative consequences, including the closing down of the business from the associated negative press coverage, the SEC might be more reluctant to bring lawsuits against firms, particularly big ones. Indeed, when examining enforcement actions against corporate entities, the likelihood of going to court was just 2 percent for a big firm and 16 percent for a small firm. More surprisingly, however, the SEC seemed less willing to send to courts individuals associated with big firms, compared to their small-firm counterparts: the likelihood of going to court was 53 percent for big-firm employees, compared to 71 percent for small-firm employees.

32

Gadinis, pp. 704-705. "These regressions indicate that, after controlling for violation type, disgorgement amount, and all of the other factors mentioned above, cases involving big firms and their employees are more likely to end up in administrative proceedings, while cases involving small firms and their employees are more likely to end up in court." *Id.*, p. 708. "In other words, for the average violation and level of disgorgement, a big-firm employee is less than half as likely to end up in court than a small firm employee. *Id.* P. 709.

Why? Professor Gadinis suggests a motivation. "Administrative proceedings offer to defendants some key advantages as compared to civil courts, particularly with regard to the public release of information about the defendants' misconduct." *Id.*, p. 688. In judicial actions, "the Commission typically issues multiple public releases, including the filing of the Commission's complaint and the announcement of the settlement." *Id.* p. 689. What better way to keep up the pretense pointed out by Professors Barth, Caprio & Levine of effective enforcement by the SEC than bully small broker/dealers into public submission? *Op. Cit.*, Guardians of Finance.

Faced with limited bureaucratic resources, the Commission is better able to maintain its pretense by picking on small entities that cannot generally afford the defense costs or adverse publicity attendant to an SEC investigation and judicial action. "The first concern is that the SEC has limited bureaucratic resources, and thus might be willing to accept a less aggressive settlement against defendants with sophisticated legal teams in order to turn its attention to other cases." Gadinis, p. 724.

"A second concern raised in the literature is that the SEC officials may show favoritism toward important broker-dealers, either because they seek to increase their chances of finding future industry employment, or because they have to share the industry's perspective." *Id.*, p.

33

725.   "Since private sector employment is central to SEC officials' professional origins and future moves, it could affect their conduct in the enforcement proceedings through various channels." *Id.*, p. 724.

And so it is that the Commission staff comes to the arrogance of power so flagrantly displayed here: disregarding its own rules, acting in bad faith, acting outside its jurisdiction, imposing increasingly unbearable costs on a small broker/dealer, in an effort to bludgeon it into submission, aiding the Commission's public charade of effective enforcement.   But instead of buckling under, these Plaintiffs insist on protecting their rights, both statutory and constitutional.

### POINT II

### ALTERNATIVELY, PLAINTIFFS HAVE SHOWN FAIR GROUND FOR LITIGATION AND A BALANCE OF HARDSHIP TIPPING IN THEIR FAVOR

The Second Circuit approaches the likelihood of success element with flexibility.   *Grand River Enterprise Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir.2007).   Specifically, "the 'serious questions' standard permits a district court to grant a preliminary injunction in situations where it cannot determine with certainty that the moving party is more likely than not to prevail on the merits of the underlying claims, but where the costs outweigh the benefits of not granting the injunction." *Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.,* 598 F.3d 30, 35 (2d Cir.2010) (internal quotations omitted).

For the reasons set forth above, at the very least Plaintiffs have more than demonstrated fair grounds for litigation.

The balance of hardships tips decidedly in Plaintiffs' favor.   Stopping the investigation right here, right now is of no disadvantage to the Commission.   The SEC has been investigating for over two years.   It has received all of Plaintiffs' corporate and personal financial records:

34

every ledger, every financial statement, and every bank account statement. It has received or can obtain from public sources all audited statements from 2009 forward for Arjent and Arjent UK. It has received all of the memoranda and every single subscription agreement for each every private placement; it has received full and complete financial information for each and every issuing entity; it has received all e-mails regarding the placements. The Commission has interviewed investors, and has sought to induce statements that would incriminate Plaintiffs.[102] The Commission concealed the FOI for two weeks while it was on the premises of Arjent LLC, thereby improperly gaining untrammeled access to documents and interviewees without facing (from the Commission's perspective) counsel's unwelcome interference limiting the Commission's inquiries to the scope of the FOI.[103] There can be no reasonable purpose in prolonging this already lengthy and damaging investigation. Either the Commission has developed evidence to charge; or it has not.

Conversely, in the absence of an injunction this investigation will continue to inflict significant damages on Plaintiffs. The Commission continues to make demands far outside the scope of their subpoenas, requiring very expensive and burdensome responses. For example, although the subpoenas requested emails regarding the private placements, the Commission has now demanded (without the benefit of a subpoena, and thus beyond the reach of judicial intervention absent this injunction) that Arjent answer questions relating to the Commission's review of emails going back to 2009.[104] To gather and review for privilege all the documents responsive to this demand is inordinately expensive and burdensome. It seems as though through two years of investigation the Commission has found naught to charge, and is now

---

[102] *See* <u>Ankers Decl.</u>, ¶¶ 3-5; <u>Gladtke Aff.</u>, ¶¶ 3, 4.
[103] *See* <u>Goodman Aff.</u>, ¶¶ 10-15; Exh. F, ¶¶ 30-33.
[104] *See* <u>Goodman Aff.</u>, Exh. KK.

35

attempting to accomplish by financially burdening Plaintiffs that which it cannot obtain through established process.

Moreover, the longer this investigation continues, the greater the intangible harm on Plaintiffs. As long ago noted by the Wells Committee, the sword of Damocles of an ongoing investigation infects all of Plaintiffs' business relationships. The longer it goes on, the more credibility it garners. And this impact has been exacerbated by the Staff calls in essence accusing Mr. DePalo of theft.

Absent this injunction, the Commission can continue *ad nauseum* without judicial restraint or review. This the Court should not permit. The time has come for the Commission to either issue a Wells letter or conclude its investigation.

**POINT III**

**PLAINTIFFS WILL SUFFER IRREPARABLE
HARM ABSENT AN INJUNCTION**

Irreparable harm is found where "but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied." *Brenntag Int'l Chems., Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir.1999).

While harm suffered by a movant is not deemed "irreparable" if it can be eventually and completely redressed through an award of damages at the conclusion of an action, this does not mean that preliminary injunctions cannot issue to enjoin financial injuries. The difficulty of computing financial loss caused by the destruction or disruption of an enterprise will frequently prevent formulation of an adequate remedy at law, justifying injunctive relief. "Major disruption of a business can be as harmful as termination, and a threat to the continued existence of a

36

business can constitute irreparable injury." *Nemer Jeep–Eagle, Inc. v. Jeep–Eagle Sales Corp.,* 992 F.2d 430, 435 (2d Cir.1993) (internal quotations and citations omitted).  Significant loss of customers or good will associated with an enterprise may also amount to irreparable harm.  *See Jacobson & Co. v. Armstrong Cork Co.*, 548 F.2d 438, 445 (2d Cir.1977) (upholding district court's finding of irreparable harm based on "ample evidence to show a threatened loss of good will and customers, both present and potential, neither of which could be rectified by monetary damages").

Here that ongoing investigatory threat, especially in light of the misstatements by Commission staff to investors, constitutes just that harm.

But even the quantifiable harm here – the undue burden and expense on a small firm of defending the investigation – is irreparable.  Even where the movant anticipates monetary injuries that are capable of valuation, courts may award injunctive relief if it appears that, absent such relief, a future money judgment would be uncollectible.

The purpose of these rules is to avoid trapping claimants in the Catch-22 "of denying an injunction to a plaintiff on the ground that money damages are available, only to confront the plaintiff at a trial on the merits with the rule that damages must be based on more than speculation." *Tom Doherty Associates, Inc. v. Saban Entertainment, Inc.,* 60 F.3d 27, 38 (2d Cir.1995).  In keeping with this objective, sister courts have concluded that irreparable harm is more likely to be present where the movant is precluded by law from seeking an award of money damages.  *See Marnell v. Kingston Public Access Cable Com'n,* 2009 WL 1811899, at *1 (N.D.N.Y. 2009)("the evidence before the Court reveals that monetary damages are not available and, therefore, Plaintiff will suffer irreparable harm absent injunctive relief"); *Cablevision Systems Corp. v. Town of East Hampton,* 862 F.Supp. 875, 888 (E.D.N.Y. 1994) (irreparable

37

injury established where "money damages, as a matter of law, are not available"). Based on the foregoing, Plaintiffs here have clearly demonstrated that they will suffer irreparable harm in the absence of interlocutory injunctive relief.

Plaintiffs are clearly precluded from suing the SEC for money damages under the APA. *See* 5 U.S.C. § 702 (waiving sovereign immunity only in "[a]n action in a court of the United States seeking relief other than money damages"). While other statutes provide parties aggrieved by the acts by federal government officials with remedies at law in certain situations, none of these statutes is apposite here. Plaintiffs cannot assert a claim under the Tucker Act, because Plaintiffs do not allege any substantive right to receive payment from the federal government, but instead injury caused by government misconduct. *See Todd v. U.S.,* 386 F.3d 1091, 1093-94 (Fed.Cir. 2004) (claims under Tucker Act "limited to actual, presently due money damages from the United States. . . . Thus, jurisdiction under the Tucker Act requires the litigant to identify a substantive right for money damages against the United States") (internal quotations and citations omitted); *United States v. Testan,* 424 U.S. 392, 398 (1976). Nor may Plaintiffs bring suit under the Federal Tort Claims Act, which permits damages awards against the federal government only "under circumstances where the United States, if a private person, would be liable to the claimant." 28 U.S.C.A. § 1346. Plaintiffs' claims rest on allegations that the SEC exceeded its statutory authority and acted in a manner inconsistent with its own regulations – but these statutes and regulations bind only the SEC, not private persons.

Plaintiffs cannot pursue a damages claim against SEC officers in their individual capacities under 42 U.S.C. § 1983, because Plaintiffs' claims do not allege any constitutional violations cognizable under that statute or the *Bivens* line of cases. *See generally, Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29

38

L.Ed.2d 619 (1971); *Omoniyi v. Department of Homeland Sec.*, 2012 WL 892197, at *10 (S.D.N.Y. 2012) ("Bivens claims, though, have only been recognized in a limited number of contexts, specifically those involving violations of the Fourth Amendment's protections against unlawful search and seizure, due process violations in the context of employment discrimination claims, and Eighth Amendment violations by prison officials") (internal citations omitted). Even if Plaintiffs could allege that the SEC had violated one of the constitutional rights cognizable under <u>Bivens</u>, the remedy provided by that line of cases is considered to be so extreme that the availability of injunctive relief under the APA operates to preclude a *Bivens* claim – not the other way around. *See Doe v. U.S. Civil Service Commission*, 483 F.Supp. 539, 574 (S.D.N.Y. 1980) ("In determining whether alternative statutory remedies preclude a constitutional cause of action, this Court concludes that a <u>Bivens</u>-style claim against the CSC would be unnecessary to the extent that the equitable relief requested would be available under the APA"). Because Plaintiffs have no available remedies at law under the APA or any statute, it would be inequitable to deny injunctive relief on grounds that Plaintiffs' injuries are compensable by damages. *See Marnell, supra*, 2009 WL 1811899, at *1; *Cablevision Systems Corp. v. Town of East Hampton, supra*, 862 F.Supp. at 888.

//

//

//

//

## POINT IV

## AN INJUNCTION SERVES THE PUBLIC INTEREST

In fashioning an exception to the doctrines of finality and exhaustion of administrative remedies, the Courts have recognized that there are instances where agency action may run contrary to the public interest. Thus, in upholding a preliminary injunction against the Department of Health, Education & Welfare, the Fourth Circuit wrote:

> The district court justified its action by invoking a recognized exception to the foregoing rules: when an agency acts in "brazen" defiance of its statutory authorization, the courts will not wait for the underlying proceedings to run their course. Rather, the federal courts will intervene to preserve the status quo, prevent the infringement of substantial rights that might otherwise be sacrificed, and protect against the subversion of congressional policy.

*Mayor and City Counsel of Baltimore v. Matthews*, 362 F.2d 914, 920 (4th Cir. 1977). *See also Gellis v. Casey*, 338 F.Supp. 651, 652-653 (S.D.N.Y. 1972)("A district court may correct a preliminary agency decision when the agency has plainly exceeded its statutory authority or threatens irreparable injury in clear violation of an individual's rights.")

And so it is here. The time has come for the Commission to stop wasting valuable taxpayer resources. Either it has discovered a violation or it has not. Over two years it has concealed a Formal Order of Investigation,[105] denied Plaintiffs their right to counsel,[106] acted (and continues to act) in excess of its jurisdiction,[107] has at least impliedly misled members of the investing public,[108] and has explicitly misled a foreign sovereign's regulatory administration.[109]

---

[105] *See* Goodman Aff., ¶¶ 10-15; Exh. F, ¶¶ 30-33.
[106] *See* Id.; Enforcement Manual § 3.3.5.2.2.
[107] *See* Goodman Aff., Exh. W, p. 4, ¶ (A)(1); Exh. Z, p. 4, ¶ (A)(1); Exh. FF.
[108] *See* Ankers Decl., ¶¶ 3-5; Gladtke Aff., ¶¶ 3, 4.
[109] *See* Goodman Aff., ¶¶ 50-51.

If using all these patently improper tactics the Commission has been unable to discover a violation (because there is none), it never will.

It is time to put a stop to these un-American tactics. It is time to put an end to the Commission's abuse of small broker-dealers; of its effort to gild its public image at the expense of our constitutional rights. It is time, frankly, for the Commission to use its scarce resources to do its real job, and not to build a reputation by bullying small businesses into submission.

## CONCLUSION

Accordingly, Plaintiffs Arjent LLC and Robert DePalo request that their motion be granted, that an injunction issue to suspend the investigation by the SEC, and for such other, further and different relief as this Court deems just and proper.

Dated: New York, New York
      October 16, 2013

                          GARVEY SCHUBERT BARER

                        By:                         

                            Andrew J. Goodman, Esq. (AG-3406)
                            Malcolm Seymour III, Esq. (MS-3107)
                            Ella Aiken, Esq. (EA-5861)
                            *Attorneys for Plaintiffs*
                            100 Wall Street, 20th Floor
                            New York, New York 10005
                            (212) 965-4534 AJG
                            agoodman@gsblaw.com